PERRY CROWL, an Insane Person, by MARTHA CROWL, His Guardian, Appellant, v. AMERICAN LINSEED COMPANY.

Division One, March 3, 1914.

1. **INCAPACITY TO SUE:** Waiver. If the incapacity of the plaintiff to sue appears on the face of the petition, defendant must raise the point by special demurrer, or else be held to have waived it; or if the incapacity does not appear upon the face of the petition, it must be raised in the answer, or is likewise waived.

2. ———: ———: **Guardian Appointed in Another State.** Where the cause of action originated in the county in which the suit is brought, the court has jurisdiction of the subject-matter; and if the plaintiff, as guardian of the insane injured party, appointed by the probate court of another State, enters his appearance by instituting suit in said court for his ward, the court thereby acquires jurisdiction of his person; and if the defendant does not, either by demurrer or answer, object that

said guardian has no capacity to sue, the question of his incapacity is waived. The point that plaintiff is lacking in capacity to sue does not go to the jurisdiction of the court to try the case.

3. NEW TRIAL: Granted on Erroneous Ground: Other Grounds Considered on Appeal. Although the trial court erred in granting a new trial on the ground that the plaintiff, being a guardian appointed by the probate court of another State for the injured party, was incapacitated to sue, the appellate court will sustain the order granting to defendant a new trial, if the trial court committed any reversible error; but that rule places upon respondent the burden of pointing out and establishing to the satisfaction of the appellate court that other reversible error was committed during the trial of the cause.

4. INSTRUCTION: Too Long. An instruction is not necessarily error because of its great length. If it deals with so many unimportant matters as to mislead and confuse the jury as to what are the real issues, it is error; but if it presents nothing more than the issues made by the pleadings and evidence, it is not error.

5. ————: Master and Servant: Ordered to Do a Particular Work. If the servant had no notice or knowledge of the danger accompanying an attempt to place a belt upon the pulley of a shaft, he had a right to assume, when ordered by the foreman to assist another servant in placing the belt on the pulley, that the foreman had ordered him to the particular place which the servant would naturally occupy in performing the work.

6. ————: ————: Guarding Belt: Variance. Where the petition charges a negligent failure to guard the belt, an instruction which required the jury to find that the shaft connection was not guarded, is not error, if the placing of a separating timber or guard between the connection and the belt would have prevented the injury. The variance is more seeming than real.

7. ————: ————: Warning of Danger: Mature Man. A laborer may be of mature years and have had a wide experience at various kinds of factory work, and yet be ignorant of the dangers attendant upon an attempt to place a belt upon a shaft, which jumped from the pulley when the machine choked or became entangled with the shaft's coupling connection having long bolts; and where he is ordered to do a work of that kind, which is not a part of his usual and ordinary work, and is ignorant of the conditions, he is entitled to be warned of the danger; at least, the question of the master's negligence in failing to warn him of the danger, is for the jury to determine.

8. **EXCESSIVE VERDICT:** $8,000. Plaintiff was employed as an ordinary laborer or "roustabout" in a linseed oil mill; was about fifty-four years of age at the time of his injury, healthy, strong and robust; the belt became entangled with a connection of the shaft, which was torn loose and fell, striking him on the head and rendering him unconscious; his skull was indented, and he was insane for a few months; his arm was broken near the shoulder, and he has never regained the use of it; there was evidence tending to show that he might use it if he thought he could, but there is none that he was simulating, and if he could use it and would not that is evidence that he is still defective mentally; his spine and kidneys were injured, and blood passed from his kidneys for several days; he was confined to his room for several months and in a sanitarium two or three months; he suffered great pain in his head, spine and arm at the time of the trial; and he was nervous, could not sleep well, and would wake up with a jerk as if frightened. *Held*, that a verdict for $8,000 is not excessive.

Appeal from Jackson Circuit Court—*Hon. Thomas J. Seehorn*, Judge.

REVERSED AND REMANDED (*with directions*).

*Hale, Dean & Higgins, Charles A. Stratton* and *Bird & Pope* for appellant.

(1) The plaintiff did not owe a cent to any Missourian, and his cause of action in suit was the only asset claimed by his guardian, and by the comity of nations, the plaintiff, by his guardian, had a right to sue, in the courts of this State to recover a debt due the plaintiff from the defendant, no creditor of the plaintiff objecting, and the action of the trial court in granting the defendant a new trial, solely on the ground that plaintiff did not have capacity to sue or maintain this suit, was erroneous. Thurston v. Rosenfield, 42 Mo. 479; Robertson v. Stead, 135 Mo. 138; Richardson v. Busch, 198 Mo. 187; Allen v. Ranson, 44 Mo. 263; Bank v. Gilpin, 105 Mo. 22. (2) If there was a want of capacity to sue and maintain this suit, it was apparent on the face of the plaintiff's amended

petition, and it should have raised it by special demurrer; and by filing a general demurrer, and by answering over on the merits, the defendant waived and abandoned its right to question the want of capacity to sue, and it could not thereafter raise the question anew by any proceeding, and the action of the trial court in granting a new trial solely on account of the want of capacity to sue and maintain this action, was erroneous, and the decision and judgment should be reversed, and the cause remanded with directions to the circuit court to enter judgment on the verdict. Planing Mill v. Church, 54 Mo. 520; State v. Sappington, 68 Mo. 454; Butler v. Lawson, 72 Mo. 227; Walker v. Deaver, 79 Mo. 664; May v. Burk, 80 Mo. 675; Y. M. C. A. v. Duback, 82 Mo. 475; Bank v. Gilpin, 105 Mo. 17; Spillane v. Railroad, 111 Mo. 555; Grenshaw v. Ullman, 113 Mo. 633; Dodson v. Lomax, 113 Mo. 555; Gregory v. McCormick, 120 Mo. 657; Jones v. Railroad, 178 Mo. 528; Hendricks v. Calloway, 211 Mo. 536; McKee v. Downing, 224 Mo. 115; Loan Co. v. Brown, 59 Mo. App. 461; Haase v. Distilling Co., 64 Mo. App. 131; Finney v. Randolph, 68 Mo. App. 557; Burnham v. Tillery, 85 Mo. App. 453; Jones v. Railroad, 89 Mo. App. 653; Alexander v. Wade, 106 Mo. App. 141; Moir v. Dodson, 14 Wis. 279; 6 Ency. Pl. & Pr., 376-378; Secs. 1804, 2119, R. S. 1909.

*Meredith & Harwood* and *Cowherd, Ingraham, Durham & Morse* for respondent.

(1) If there was error warranting the action of the trial court in sustaining the motion for new trial and in arrest, the reason assigned is immaterial. (2) The guardian appointed in the State of Kansas had no right to maintain this suit in Missouri. Plaintiff could have qualified under the Missouri statutes as a curator or guardian, and the plaintiff alleging she was duly and legally qualified, the question of her

capacity to sue was properly raised by answer. (3) The second instruction given by the court of its own motion was erroneous for the following reasons: (a) It is so long, involved, misleading, and confusing as to be unintelligible to the average layman. Williams v. Ransom, 234 Mo. 66; Stid v. Railroad, 236 Mo. 398; Gardner v. Met. St. Ry., 223 Mo. 417. (b) The jury is authorized to find from the evidence that the foreman McKee ordered Crowl to take a position of danger upon the scaffold underneath the rod or shafting. There is no testimony on which to base this instruction. (c) The jury are authorized to find that the grinding machine was choked at the time Crowl was injured; that the choking of the machine caused the belt to run off the pulley. There is no evidence tending to show the machine was choked. The only evidence upon the subject being to the contrary, and it was erroneous to submit the question to the jury. (d) The instruction permitted the jury to find that the belt ran off owing to the choked condition of the grinding machine. This was doubly erroneous because there was no evidence to show the grinding machine was choked, and even if there were, it was for the jury to say whether that was the cause of the belt running off. Regan v. Railroad, 93 Mo. 348; Glaser v. Rothschild, 221 Mo. 180; Flucks v. Railroad, 143 Mo. 17; Neas v. Railroad, 138 Mo. App. 484. (e) As a part of the negligence of defendant, the jury are told they may find the connection was not guarded. The petition pleads a negligent failure to guard the belt. The instruction must present the same issue as the pleading. (f) The instruction allows the jury to predicate negligence upon the failure of McKee, the foreman, to inform Crowl of the danger of injury arising from the unguarded condition of the connection. This is erroneous for two reasons: First, Crowl being a man of mature years and ample experience, it was not negligence to fail to give him warning; sec-

ond, the instruction is broader than the petition, in that the petition specifically states the kind of warning that should have been given, and the instruction does not follow the pleading. (4) The court erred in not giving instructions numbers 12, 14 and 15, and each of them, asked by defendant. (5) The verdict was grossly excessive. Nichols v. Glass Co., 126 Mo. 67; Burdict v. Railroad, 123 Mo. 236; Waddell v. Met. St. Ry., 213 Mo. 8; Murray v. Railroad, 47 Barb. 196. There is no action at common law for failure to guard machinery, and the first count of plaintiff's petition fails to state a cause of action. It was on this count the verdict was given, and the judgment entered. As plaintiff's petition stands therefore without cause of action stated, the case should be finally disposed of in this court. Bair v. Heibel, 103 Mo. App. 632; Lore v. Mfg. Co., 160 Mo. 608; Czernicke v. Ehrlich, 212 Mo. 386; Lohmeyer v. Cordage Co., 214 Mo. 685.

WOODSON, P. J.—The plaintiff, an insane person, by his guardian, appointed by the probate court of Wyandotte county, Kansas, instituted this suit in the circuit court of Jackson county, Missouri, against the defendant, to recover the sum of $35,000 damages for personal injuries sustained by him, through the alleged negligence of the agents and servants of defendant, in operating a certain piece of machinery, mentioned in the evidence, and the shafting and belting used in connection therewith.

A trial was had before the court and jury which resulted in a verdict and judgment for the plaintiff for the sum of $8,000. Motions for a new trial and an arrest of judgment were timely filed, assigning the usual grounds therefor, and specially that the guardian of plaintiff had no legal capacity to sue in the courts of this State. The court sustained the motion for a new trial solely for the reason that the guardian had no legal capacity to sue in the courts of this State.

From the order granting the new trial, plaintiff duly excepted and appealed the cause to this court.

The facts are few and practically undisputed, save two, namely, the question of contributory negligence, and the extent of the plaintiff's injuries.

The undisputed facts are as follows:

The defendant was a corporation duly organized and doing business under the laws of this State, with its offices and works at Kansas City, Missouri. It was engaged in the manufacture and sale of linseed oil, flax meal and the by-products thereof. David Dietrick was the superintendent of the defendant's plant, and S. A. McKee and W. S. Brown were the foremen of the pressroom thereof, the former on the day and latter on the night shift. The pressroom was on the first floor with a basement beneath.

The pressroom was sixty by eighty feet, and in this room there was a grinding machine and another machine called the feeder, or one machine composed of two parts as stated, which conveyed the oil cakes to the grinder. This machinery was run by a line shaft and a counter shaft. The latter was about fifteen feet north of the former. From the counter shaft two belts ran, one to the grinding machine, which sat on the floor below, and the other to the feeder. There was also a third belt connecting the line shaft with and operated the counter shaft. These shafts were furnished with pulleys of various dimensions, upon which the belts ran. The counter shaft is what is known as a dead or still shaft, and never moves until it is connected with the line shaft by means of a belt. The manner of connecting the two was to first put the belt over the pulley on the dead or still shaft and then push or slip it onto the pulley of the line shaft; at times this was done while it was running and at others while it was still. The latter shaft, if I correctly understand the record, was never still while the engine was run-

ning, and the former was never in motion except when connected to the line shaft by means of the belt.

The counter shaft was fastened to two pine posts, twelve or fourteen inches square (upon which the ceiling rested) and about twelve feet apart, standing east and west, by means of iron hangers or sockets screwed or bolted to the posts by large screws or bolts, in which the ends of the shaft rested and revolved. This shaft was of iron and was about one and a half inches in diameter, and the pulleys were made of iron and wood and fastened to the shafts by means of set screws. The line pulley was thirty inches in diameter and with an eight-inch face, and the counter shaft pulley was twenty inches in diameter with a twelve-inch face. Both shafts ran east-and-west and parallel to each other.

The coupling is not particularly described by any witness, but Mr. Dietrick, the superintendent of the defendant company, testified "That the coupler was a regular standard coupler." And Mr. Gant, a witness for plaintiff, was asked: "Q. Just describe that coupling. A. Well, I don't know as I could describe it, of course, it is simply the coupling, and the shaft where they come together. Q. Did the ends of the shafts come together there? A. Right close together; yes, sir." This coupling was only about six inches from the pulley on the line shaft, and the ends of the plates which formed this shaft connection were round and extended about two inches above the surface of the shaft. These plates were fastened together by means of bolts, some four in number.

The witnesses Walker and Foster give a more intelligent account of the situation and the accident than any other witnesses.

Walker in substance testified as follows: That he was working for the American Linseed Company at the time Crowl was injured in the pressroom. He had put the belt on the pulley several times, on the grind-

ing machine, before Crowl was hurt. He had noticed the operation of the grinder and noticed that it got choked up. It got choked up every few minutes; it got choked up pretty often; sometimes it would run for hours and sometimes it would not run for five minutes. He tried to put the belt on the live pulley when the tailing machine was choked up and the machine belt would come off as he was putting it on the live pulley. Had noticed that the shaft connection was about six inches from the pulley when that belt worked; that the bolt heads projected up a ways (as shown by the picture presently to appear), and the belt could catch on the bolt heads; they projected out about one-half to three-fourths of an inch. There was a projection in the connection bolt of probably two or three inches. If the machine choked the belt would go off, sometimes on the side, and sometimes continue on the roller, and sometimes it would run forward toward the connection bolt, and he had noticed it go beyond the live pulley and towards the bolt connection. The plate connection was on the east side of the pulley. It would run off pretty close. The bolt connection was not over six inches from the pulley. The bolt heads were about six or eight inches from the pulley. The bolt heads went around with the shaft.

The shaft was composed of two pieces, which were joined end to end with what is called an ordinary standard coupler, of which the following is a picture:

## STANDARD RIBBED COMPRESSION COUPLINGS.

The belt was five or six inches in width. The bolts indicated by the picture clamped the two parts of the coupler firmly against the two connecting ends of the shaft, thereby making the shaft one continuous piece.

This witness did not see the accident. He was not on duty that day.

J. W. Foster testified that he was working for the American Linseed Company three years, worked there a year before Crowl was hurt and was there that day and saw him when he was hurt and helped pick him up; he was lying on some iron housings, when he picked him up; he was on the floor eight or nine feet from the scaffold, on the south side of the scaffold. Plaintiff was unconscious. They took him away as soon as he fell, into the boiler room where it was warm.

He had helped put on the same belt on the live pulley. He knew the machine since it was put in. The machine had been clogged up before Crowl was hurt. It was clogged up pretty often. It shut it down and threw the belt off every time; several times it was choked up and when he tried to put the belt on he could not move it and the belt would come off. It usually slipped off to the west towards the pulley from four to six inches. It would slip off towards the connection plate. It was about an eight-inch belt. The connection plate would have to take hold of the belt and it would have to go off towards the west because it was not guarded there. The belt was too wide between the pulley and the coupling, and it would have to wind up there somewhere. There was a square edge there. It was possible to guard that connection so as not to interfere with the operation of the machine. There was a way to guard it by a piece of 2 by 4 and an iron rod up there, and fastening it to the ceiling. There was about six inches of space between the pulley and the shaft connection. He would put the 2 by 4 over the rafter and nail it to the floor and put it about a quarter of an inch from the pulley; that would not interfere with the practical operation of it. There was no guard there when Crowl was hurt. He saw Crowl doing heavy work, with the defendant; saw him wheeling barrows, about 500 or 600 pounds to the barrow. The shaft that fell was lying right on the scaffold, crosswise of the scaffold. The live pulley was just south of the shaft. To put the belt on, you would have to reach or bend over. There was no platform or staging on the north side of the shaft. At the time Crowl was hurt, there was nothing that he could have stood on at the north side of the shaft. There was no space where he could have stood, except on the south. One part of the shaft was up on the hanger and the other was lying on the scaffold. There was no platform there north of the shaft. A man

going up that platform would have to go up on the south side; there was no board there to get over on the north side.

The belt slipped off frequently when the grinder got clogged. When the grinder got clogged up it would either burn the bracket or run off. He had seen it burn three or four times. Saw it burn about two o'clock, before plaintiff was hurt; and about two weeks thereafter the small belt burned. It would get so hot it would smoke up. When the grinder got choked up, you had to unchoke it or the belt would come off. He had seen the machine taken apart to unchoke it a good many times in a day.

Edward B. Barker also testified that he was acquainted with the construction of machinery, belting and shafting and had superintended the putting up of mills, and had had charge of such work for thirty years; that he had worked for the American Linseed Company and was working there when Crowl was injured. He was working there four months befor Crowl was injured. He was acquainted with the belt that Crowl was putting on, and with the pulley and the shaft that fell. He had noticed the construction of that shaft before that time and he noticed the compress coupler. It was from four to six inches from the pulley. He had noticed similar construction in mills and elevators in Kansas City; they are used in certain classes of work. What they call a ''face coupler'' is also used—the two faces bolted together with bolts. It was reasonably possible to have guarded the press coupler in the defendant's mill without interfering with the moving of the belt on the pulley and the coupling on the shafting. You could do that by putting up a guard, hanging it to the ceiling above, coming up against the edge of the pulley around the shaft and extending it over to keep the belt from falling off from that side of the pulley onto the coupling. That would not interfere with the running of the belt

on the pulley or the coupler on the shaft. He would use wood in making the guard and the cost would be about five dollars. The hangers that were used there to which the shaft was suspended were two and fifteen-sixteenths inch post hangers. He saw Crowl three or four minutes after he was hurt. He was being picked up and carried away by some men. He also saw him when he started to go up on the platform. He went up on a ladder on the north platform to the south side of the post that the shaft was hanging to. There was no platform on the north side of the post. He was acquainted with the tailing or grinding machine. He knew it to get choked up frequently, a number of times a day; has known it to run all day without getting choked up. The choking of the mill would cause the belt to run off. If the belt was too slack it would run off, which was caused by the stopping of this disc machine, one disc revolving, and it feeding through an opening all the time. The choking of the machine would cause the belt to fly off, because it stops this lower pulley which was supposed to work the machine. The belt that ran off was more frequently the belt that ran the grinders; never found the other one off.

That he worked with Crowl for more than three months; that he never smelled any liquor on his breath. Crowl was his helper; he was a strong man. That he noticed the lapping of the belt at the time when the belt would run off. The belt would be very liable to lap if it ran on this side of the coupling, because the surface of that coupling is broken where the bolts go in. It would take that belt around and cause it to lap. If the belt laps, if it is around another shaft and the shaft is more substantial, it would pull the belt in two or stop the other shaft. About the lapping of belts, he did not think is was unexplainable, but thought they knew why it happens.

As stated, the evidence for the plaintiff tended to show that the heads of these bolts extended some distance, about a half an inch, above the surface of the connecting plates, while that for the defendant tended to show to the contrary.

At the time of the injury the witness Gant, and Crowl, the plaintiff, were standing upon a platform or scaffold, about nine feet above the floor.

The platform consisted of two parts, or rather two platforms, about twelve feet apart, and were composed of loose timbers nailed to the posts, previously mentioned.

The plaintiff was injured while assisting the witness, Gant, in putting the belt on the pulley that ran the grinding machine.

The grinding machine had been out of order for a month or more. It would choke up and stop frequently, at times every day, at others, several times a day, and again every few minutes. When that would occur, it threw the belt from the pulley on the counter shaft.

The witnesses for both parties testified as to the defective condition of the machine. One of the foremen for the defendant testified that it was not worth "shucks."

Gant gives substantially the following account of the accident, viz.: That the belt had jumped off and he and plaintiff were putting it on the pulleys that ran the grinding machine; that he was standing on a platform near the line shaft and plaintiff was standing upon another near the counter shaft; that the plaintiff had placed the belt upon the pulley on the counter shaft, as I understand the record, and was trying to hold it on with a stick, while the witness was putting the other end over the pulley on the line shaft. The belt did not stay or scarcely any time and when it ran off, it caught on the coupling and wound around the shaft and pulled the shaft off of the posts which

supported it. The belt jumped off into the connection
and just caught and wrapped around the shaft. It
caught on the connection plate and that threw the
shaft from the hangers. It tore the hangers out at
both ends and pulled the shaft down. The end where
he (Gant) was pulled loose from the shaft, and the
end where Crowl was was pulled down on the floor,
and when the belt caught he kind of got behind the
post, and the next he saw Crowl was lying down on the
floor. Crowl was standing on the south side of the
shaft between the shaft and the belt. He (Gant) was
on the south side of that. Crowl fell on some iron
housings on the floor. Two of them were on the floor.
Crowl was merely standing facing it and holding the
belt on, on the platform, just before the belt ran off.
Crowl was facing north with his back to the south to-
ward Gant. Crowl made no outcry. The other pulley
was turning on another shaft when it had got to blazing
and he threw that out of gear. He (Gant) just stepped
behind the post and he got there pretty quick. He
called to Crowl, but possibly he never heard him. He
would have to talk quite a bit above the ordinary tone
to make one hear on account of the noise of the ma-
chinery there. Never saw Crowl make a movement.
The hangers on the south side of the post, about ten
feet from the floor, were one-half to three-quarters
cast iron, possibly sixteen pounds in weight alto-
gether. Lug screws held the hangers to the post, five-
eighths inch screws and six inches long. The posts
were mostly pine, soft wood. The hangers broke, and
some of the lug screws broke off, leaving two lug
screws and the loose part of the hanger on the post.
Both hangers were that way. The pulleys were
twenty-four inches apart. The belt was on the west
end of the shaft. It was steam power. He put the
belt on as much as he thought would answer and it
went off on the far side from him and caught on the
connection, and in throwing it on, he went on the east

side of the pulley. It went right over the pulley in going off on the east side. It got caught in the connection. It was off on the other side as soon as it was on. He put the belt on when his judgment said to put it on. The belt caught on the plates that held the coupling together and began wrapping around. The belt either caught on the *plates or on the bolts that hold the plates.* They were putting on the belt in the usual way; put it on and let it run on. The belt just fit snug. McKee said the mill ought to be thrown in the river; that it wasn't any account; it could not do the work.

David Dietrick, the superintendent of defendant's plant, testified that the plant started work about August, 1908. That he was at lunch when Crowl was injured. That the shaft was resting on regular post box hangers. The one and fifteen-sixteenth inch was the smaller shaft, the one that broke. The other was the line shaft. The line shaft ran across five posts and the countershaft across three posts. The line shaft was south of the countershaft. It was a comparatively new belt on the line shaft. When he saw it three-quarters of an hour after the accident, the west end of the countershaft was lying on the floor and the east end on the scaffold. No part of it was attached to the post. It had been taken down. The grinder choked up, and when it choked up the smaller belt, the five-inch belt, would slip off. He had known it to be slipping there quite a while. There was no bolts or nuts on the heads of bolts that protruded towards the face or surface of the coupler. The coupling was put in in May or June. It was about six inches from the pulley. It was impossible to tell just what would cause the belt to lap or kink or hang on a shaft that is in motion. Had known them to kink and had known them not to. That the coupler was a regular standard coupler. That in putting on the belt they always put the dead end of the belt on first. They

generally put the belt on the side that is running from them. Now, assuming that the machinery had started and was moving the main line shaft and a man starts to put the belt on the pulley standing west of it, it could not possibly run off on the east side of the pulley in less than one revolution of the pulley. The pulley revolved over to the north. That the choking of the grinder threw that belt off. The belt (second belt) was comparatively pliable. It was pretty close to a quarter of an inch thick. There was *nothing besides choking to throw the belt off, if it was in line.* Gant should have put the belt on the edge nearest to him and it would not have run over. The pulley Gant was putting the belt on makes 150 revolutions a minute. Anyone holding the belt on the pulley could have done so from the north side of the post as well as the south side. He found nothing to cause the belt to kink. He did not examine the coupler.

W. S. Bowen testified that he was foreman of the pressroom of the defendant and was such foreman when Crowl was injured. He was on the night shift. The grinder became choked and then sometimes the belt would run off. The live pulley would have to be put on first. It choked up most of the time and they had to guard against the belt slipping off, and they had a board or guard placed a little closer to the pulley than an inch. It was not dangerous so close as an inch to the pulley and it was not dangerous by reason of the belt rubbing against the board. He never knew that belt to get down between the guard and the pulley. It never did get in that shape, but if the belt touched the guard it would have a tendency to put it back in place.

S. A. McKee testified that he was foreman of the pressroom on the day shift. The pressroom is on the first floor above a cellar, and is 60 by 80 feet. He told Crowl to help Gant put on the belt. There was one square 16 by 16, then a scaffold runs across from that

to the post where the countershaft was that he was at; that all he (Crowl) had to do was to go up and go over to that platform and then over to this and he was standing holding the belt on, and Gant was on another scaffold throwing the belt on. Gant and Crowl were facing each other. Crowl would be on the west side of the pulley and Gant would be still south of him. Crowl was at the dead pulley. The connection was about six inches from the pulley. Sometimes the grinder would get choked. It would get choked so badly that it would throw the belt off. The choked condition of the grinder could cause the belt to run off the pulley. The shaft on the post ran east and west. The hangers were on the south side of the post, the same side that Crowl was standing on, and when the shaft was pulled from the hangers it would be thrown right against Crowl if he was on the platform. *The belt must have lapped and the belt would not give and something else had to.* He had run the grinder for twelve hours without its choking and then again it would choke three or four times in twelve hours. He said several times that the grinder was not worth "shucks." Some of the screws were pulled out and the hangers were left on the posts. The countershaft is known as a dead shaft. The connection was very much smaller than the pulley. The pulleys were absolutely in line. Crowl could not have stood west of the point where he did and hold the belt on the pulley. The posts were 12 by 12 inches. Generally it is all in the way you put the belt on. Gant said, "The belt lapped and I got behind the post." He did not think Crowl put the belt on his pulley. The platform ran parallel with the shaft. He never inspected the grinder to see if it was choked before ordering the belt put on. *If the belt did run off it was liable to lap.*

The shaft in falling struck plaintiff and knocked him senseless from the platform on which he was standing.

The plaintiff was about fifty-four years of age at the time of his injury and was healthy, strong and husky; some of the witnesses stating that he was about the strongest man in the mill. His injuries consisted of a broken arm (right) near the shoulder, an indentation in the skull, and injuries to his spine and kidneys and many bruises about the body. He was confined to his room for several months, and in a sanitarium for two or three months. He suffered great pain in his head, spine and arm at the time of the trial; he was nervous and could not sleep well, would wake up with a jerk as if frightened, and had never regained the use of his arm.

There seems to be no question but that plaintiff went insane a few months after his injury. His type of insanity was what is termed religious *mania*. There was evidence tending to show an injury such as plaintiff received on the head, might cause that character of insanity.

At the time of the trial the plaintiff had greatly improved physically, yet he had not fully recovered, as previously stated; but mentally he had apparently completely recovered; and he testified at the trial, after having satisfied the circuit court that he was mentally sound.

The plaintiff's evidence tended to show that he had no knowledge of this particular character of work, and was ignorant of the danger incident thereto; also that defendant neglected to notify him of said danger, which was not apparent to the ordinary workman and observer.

Defendant introduced evidence tending to show that plaintiff was guilty of contributory negligence; also that his injuries were not so serious as his evidence tended to show.

Among other instructions asked and given by the court at the request of counsel for appellant, with

slight alterations, was number two, which reads as follows:

"2. If you believe and find from the evidence that on or about September 28, 1908, and at about the hour of noon of said day, Perry Crowl was in the employ of the defendant at its mill at or near Thirty-second Street and Roanoke Boulevard, in Kansas City, Jackson county, Missouri, then the court instructs you that it was the duty of the defendant to provide plaintiff with a reasonably safe place to work and not to expose him to a danger that could have been foreseen and guarded against by the exercise of ordinary care on its part, and by ordinary care is meant such care and caution as a reasonably prudent person, engaged in the same or a similar business, would have exercised under the same or similar circumstances. And if you further believe and find from the evidence that at said time and place Sam McKee was a foreman of the defendant, and ordered said Crowl to go upon a wooden scaffold about nine feet above the floor, and underneath a rod or shaft where a belt passed around a pulley about twelve inches wide, and assist one Henry Gant to put said belt in place upon and around said pulley and around another pulley about twenty-four inches in diameter and about ten inches wide, and that said Crowl did so, and that east of said pulley 10 inches wide and about six inches from it was a connection fastened to the same shaft on which was located said pulley ten inches wide; that from a pulley on the same shaft as was located said pulley twelve inches wide a belt extended downwards to a machine used to grind tailings from the trimming room of the mill of the defendant; that said grinding machine was choked and prior to said time had often become choked; that said Crowl stood on said scaffold underneath and south of said rod and shaft and was holding said belt on to said pulley on the same shaft as said pulley twelve inches wide, with a stick, and

that said Henry Gant placed said belt around said pulley ten inches wide, and that said pulley was revolving at the time, and that owing to the choked condition of said grinding machine said belt was caused to run off of said pulley ten inches wide to the east and against said connection and caught on said connection; that said connection was not guarded so as to prevent said belt from running against said connection, and that it was reasonably practical to guard the same and that said guard would not have interfered with the operation of said belt, pulley and connection, and that a reasonably prudent person, under the circumstances, would have guarded said connection, and that if it had been guarded the injury (if any) to Perry Crowl would have been avoided; that said rod or shaft near and north of plaintiff was fastened to hangers held on to the south side of some upright timbers by lug screws; that by reason of said belt catching onto said connection the same was caused to lap and to become tightened and tangled thereon, the strain of said belt broke said rod or shaft from its supports and it fell down and upon said Crowl and caused him to fall from said scaffold to the floor below and be injured. And if you further believe and find from the evidence that the place or work of said Crowl was not reasonably safe, by reason of the unguarded condition of said belt and pulley and that said Sam McKee directed the plaintiff to work at said place and that plaintiff did his work as he was directed to do by said Sam McKee, and that said Crowl did not know of the unguarded condition of said connection, or of any danger (if any) of injury arising therefrom, and was not informed of any such danger by said Sam McKee, and that plaintiff did not know that his place of work was not a reasonably safe one, and was not so informed by said Sam McKee, and that said Crowl was inexperienced at said work, which inexperience was known to said McKee, and he was not told of said danger

(if any) ; that the place of work of said Crowl, for the reasons above mentioned, was not a reasonably safe place for plaintiff to work and that the defendant knew, or by the exercise of ordinary care under the circumstances should have known, that said place of work was not reasonably safe, then the court instructs you that the defendant was negligent, and that the danger (if any) of injury (if any) from such negligence was not an ordinary risk of his employment, and you will find for the plaintiff as guardian of Perry Crowl, on the first cause of action herein, and against the defendant, in such sum as the evidence shows is a full, fair and just compensation for the injuries (if any) sustained by him, considering their nature and character as shown by the evidence, not exceeding, however, the sum of $35,000, the amount claimed by plaintiff in his petition.''

And the court refused to give the following instructions, among others, asked by counsel for respondents, viz.:

''12. If you find and believe from the evidence that the work of holding the belt upon the dead pulley on the countershaft, did not require any special skill or experience, then the court instructs you defendant was not required to give any specific instructions to plaintiff before sending him to perform such work.

''13. The court instructs the jury that there was no obligation upon the defendant to place any guard or guards near the belt in question to prevent the same from running off from said pulley.

''14. The court instructs the jury that there is no evidence in this case that the condition of the grinder mentioned in evidence or the choking of the same had anything to do with the causing of the injuries complained of by plaintiff in this petition.''

Such additional facts as may be necessary to consider in the discussion of the case, will be mentioned in the opinion.

I.  It appears from the foregoing statement of the case that the trial court granted the defendant a new trial for the sole reason, as recited upon the record proper, that the plaintiff, an insane person, had no legal capacity to sue in the courts of this State, by his guardian, appointed by the probate court of Wyandotte county, State of Kansas.

*Incapacity to Sue: Waiver.*

Counsel for appellant do not seem to take issue upon that proposition, but practically pass it by and insist that whether that be true or not, since, however, that fact appeared upon the face of the petition, respondent waived that question by not demurring and by answering over to the merits; and therefore ask that the judgment of the circuit court, granting the respondent a new trial, be reversed and that the judgment for $8,000 rendered by that court in behalf of appellant be reinstated.

It is fundamental that the misjoinder or nonjoinder of parties and the incapacity of a party to sue, do not go to the merits of a case, and for that reason our Legislature, almost at the incipiency of our jurisprudence, enacted a statute providing, among other things, that "the defendant may demur to the petition, when it shall appear upon the face thereof, . . . that the plaintiff has not legal capacity to sue," etc.  This statute has been preserved practically without amendment from that time to this, and is now section 1800, Revised Statutes 1909.

In compliance with the plain mandate of that statute this court, as well as the various courts of appeals, have repeatedly held that where the incapacity of a trustee, assignee, executor, administrator, curator, guardian or any public officer to sue, appears upon the face of the petition, it became the duty of the defendant, if he wished to rely upon that point, to raise the same by a special demurrer, and where such incapacity in fact existed, but not appearing upon the

face of the petition, then it became the duty of the defendant to raise the point by answering, and that the failure to so do in either case waived the question, and it could not be taken advantage of after verdict. Among the numerous cases so holding are the following: Fulwider v. Gas Co., 216 Mo. 582, l. c. 594; Baxter v. St. Louis Transit Co., 198 Mo. 1, l. c. 6; Gross v. Watts, 206 Mo. 373, l. c. 393; Ashton v. Penfield, 233 Mo. 391, l. c. 418; State ex rel. v. Fidelity & Guaranty Co., 236 Mo. 352, l. c. 365; McKee v. Downing, 224 Mo. 115, l. c. 126; Metropolitan Street Ry. Co. v. Adams Express Co., 145 Mo. App. 371; Anable v. McDonald Land & Mining Co., 144 Mo. App. 303; Nold v. Ozenberger, 152 Mo. App. 439; Mann v. Doerr, 222 Mo. 1; National Handle Co. v. Huffman, 140 Mo. App. 634; Sawyer v. Burris, 141 Mo. App. 108; and many others too numerous to cite.

The only distinction between the cases cited and the case at bar is that in those cases the various representatives of the respective plaintiffs were the creation of our laws, while in the case at bar the guardian was appointed by the probate court of our sister State.

In the case at bar the cause of action was not only transitory, but it originated in Jackson county Missouri. That, of course, gave the circuit court of that county jurisdiction over the subject-matter of the cause; and when the plaintiff, through his guardian, entered his appearance in that court, by instituting this suit, it gave the court jurisdiction over his person. From this it is self-evident that the circuit court of Jackson county had jurisdiction of both the plaintiff and the subject-matter of the suit. And that being true, there was no lack of power or authority in that court to try and adjudge the case. The question of the capacity of a party to sue does not go to the jurisdiction of the court to try the case, but is a question of procedure, pure and simple; and clearly under the statute previously quoted, the right of the respondent

to insist upon the incapacity of the plaintiff to sue in this State by his guardian, appointed by the probate court of another State, was clearly waived.

Our attention has not been called to any authority drawing a distinction between the principle which governs the one and should govern the other; and after a somewhat extensive examination of the authorities, we have been unable to find any authority construing a statute like ours and holding contrary to the rule above stated.

But independent of that, by parity of reasoning, it seems to us that the same rule should be applied to both classes of cases; and for that reason, we hold that the circuit court clearly erred in granting a new trial for the reason assigned, namely, that the plaintiff had no legal capacity to sue.

II.   Counsel for respondent seem to have realized the unsoundness of the position contended for in paragraph one of this opinion, by passing to and seizing upon the familiar rule of practice, that, if the court committed any reversible error during the trial of the cause, whether assigned as a ground for granting the new trial or not, this court will consider the same and affirm the judgment granting the new trial, regardless of the erroneous reason assigned by the court therefor.

*New Trial: Any Ground Not Assigned.*

While that rule is securely fortified by numerous decisions of this court, yet it carries with it the burden of requiring the respondent to point out and establish to the satisfaction of this court that such error was committed. Assuming this burden, counsel have undertaken to point out and satisfy this court that the trial court committed such error by presenting the following objections to instruction numbered 2 given for the appellant:

*Instruction.*

"The second instruction given by the court of its own motion was erroneous for the following reasons:

"(a)   It is so long, involved, misleading, and confusing as to be unintelligible to the average layman.

"(b)   The jury is authorized to find from the evidence that foreman McKee ordered Crowl to take a position of danger upon the scaffold underneath the rod or shafting.   There is no testimony on which to base this instruction.

"(c)   The jury are authorized to find that the grinding machine was choked at the time Crowl was injured; that the choking of the machine caused the belt to run off the pulley.   There is no evidence tending to show the machine was choked.   The only evidence upon the subject being to the contrary, and it was erroneous to submit the question to the jury.

"(d)   The instruction permitted the jury to find that the belt ran off owing to the choked condition of the grinding machine.   This was doubly erroneous because there was no evidence to show the grinding machine was choked, and even if there were, it was for the jury to say whether that was the cause of the belt running off.

"(e)   As a part of the negligence of defendant, the jury are told they may find the connection was not guarded.   The petition pleads a negligent failure to guard the belt.   The instruction must present the same issue as the pleading.

"(f)   The instruction allows the jury to predicate negligence upon the failure of McKee, the foreman, to inform Crowl of the danger of injury arising from the unguarded condition of the connection. This is erroneous for two reasons:

"(1)   Crowl being a man of mature years and ample experience, it was not negligence to fail to give him warning.

"(2)   The instruction is broader than the petition, in that the petition specifically states the kind of warning that should have been given, and the instruction does not follow the pleading."

We will consider these objections in the order presented.

(a)  Regarding the first:

There can be no question but what an instruction may be so long drawn out, and deal with so many wholly unimportant matters, as to mislead and confuse the jury as to what are the real issues presented to them for determination. [Williams v. Ransom, 234 Mo. l. c. 66; Stid v. Railroad, 236 Mo. l. c. 398; Gardner v. Metropolitan St. Ry. Co., 223 Mo. 389, 417.]

But unfortunately for respondent, counsel for respondent have not pointed out wherein this instruction is too long or wherein it was calculated to mislead or confuse the jury in that regard. After a careful reading of the instruction, I am unable to see that it contains any superfluous matter; it seems to submit to the jury nothing more than the issues presented by the pleadings and which the evidence tended to prove. This objection is, therefore, ruled against the respondent.

(b)  This objection is equally untenable. While there is no direct evidence showing that McKee ordered the appellant to take the particular place upon the platform that he did, yet it is undisputed that he ordered appellant to go and assist Gant in placing the belt on the pulley, and that in order to so do, it was absolutely necessary for him to approach the pulley on the dead shaft in order to place the belt thereon and to hold it there while Gant put it upon the pulley on the line shaft. And appellant having no notice or knowledge of the danger which overhung him, may well have assumed that McKee ordered him to that particular place. We, therefore, decide this insistence against respondent.

(c)  There is no substance in this objection. The record is full of evidence tending to show that the belt ran off recause the grinder became choked, almost

every day, and frequently every few minutes, and as one witness testified, every five minutes. And in the instant case, Gant testified that the belt remained on but a very short time; and Dietrick, the superintendent of respondent, said *there was nothing besides choking to throw the belt off*. The jury were therefore warranted in finding that the belt was thrown off by reason of the machine choking.

While there was evidence to the contrary, yet that was a question for the jury, and was very properly submitted to them by this instruction.

(d) This objection is practically the same as that presented in objection (c), differing principally in verbiage, and the ruling there announced is a complete answer to this.

(e) This objection is highly technical. The guarding of the connection of the shaft as here understood, was the same as guarding the belt from the connection. It was the contact of the belt with the connection, which had bolts extending from a half to three-quarters of an inch above the surface of the connection plates, that appellant's evidence tended to show caused the belt to catch and wind around the shaft and pull the latter from its fastenings to the posts, which, in falling, struck and injured plaintiff, or rather knocked him from the scaffolding and by those combined forces he was injured. If either the belt or the connection had been guarded, or rather separated, from each other, this accident could not have happened, and it was wholly immaterial whether the *belt was separated from the connection* by the "two by four" or whether the *connection was separated from the belt* by the "two by four timber" mentioned in the evidence. It was the failure to place the separating timber or guard between the two that constituted the negligence, and not the fact that the one was mentioned rather than the other.

(f)   There are two reasons assigned in support of this objection, as previously stated. We will consider them in the order stated.

(1)   It is insisted that since the evidence showed that the appellant was a man of mature years and wide experience in other branches of industry, there was no duty resting upon respondent to notify him of the existence of the danger which resulted in his injury.

The conclusion stated by counsel is not a necessary sequence to the premises upon which it is predicated. A man may be of mature years and may have had wide experience in various lines of industry, which are almost as numerous as the sands of the sea shore, yet he may be absolutely ignorant of many of them and the dangers incident thereto, as the evidence tended to show the appellant was in this case. The evidence tended to show that he was an ordinary day laborer, "a general roustabout," and was performing that duty for the respondent at the time he was ordered to assist Gant to replace the belt. The evidence also tended to show that he had worked for various packing companies in the same capacity for several years in Kansas City, prior to his employment by respondent. This does not signify that he was familiar with machinery or its workings, much less the dangers incident to a belt encircling two shafts, jumping from a pulley and becoming entangled with the coupling, which of necessity, or as McKee, one of respondent's foremen said, "The belt must have lapped and the belt would not give and something else had to," which of course was the shaft, as there was nothing else there to give way. Under this state of facts it evidently was the duty of McKee to have warned appellant of the danger attending the work he had just ordered him to do, knowing doubtless that that was not a part of his usual and ordinary work, or at least that was a question that should have been left to the jury.

There is no merit in this insistence.

(2)   Attending the second: ''The instruction is broader than the petition in that the petition specifically stated the kind of warning that should have been given, and the instruction does not follow the pleading.''

Counsel have not briefed or argued this point nor pointed out the particular variance complained of, consequently we suppose it has been abandoned, and will treat it as such.

III.   This brings us to the consideration of instructions numbered 12, 13 and 14, asked by the respondent, and refused by the court.

**Defendant's Instruction.**

They are set out *in haec verba* in the statement of the case, and need not be here repeated.   By reading them it will be seen that they *declare as a matter of law* that the appellant was not entitled to a recovery upon the facts predicated in said instruction numbered two, given for the appellant.   In our consideration of that instruction, we held that the facts stated therein were sufficient to carry the case to the jury, and if that ruling is correct, then necessarily these instructions asked by respondent do not correctly declare the law, and the court properly refused them.

IV.   The last ground assigned for an affirmance of the judgment is that the verdict is excessive and unconscionable.

We are unable to lend our concurrence to this contention.   The evidence tended to show, and in my opinion, practically all of it showed, that the appellant was an unusually strong man, capable of handling from six to eight hundred pounds more of material in a day than any other man in the factory; that he was knocked senseless; his right arm was broken near the shoulder; his skull was in-

**Excessive Verdict.**

dented for a space about two or three inches in length, and a half of an inch in breadth; that his spine and kidneys were injured, and that he was battered and bruised more or less all over his body.

The evidence also tended to show that he suffered great physical pain and mental anguish; that he passed blood from his kidneys for several days; that he became insane from the effects of the injury and remained so for several months; that his arm has never sufficiently recovered to enable him to use it; that his head and back still pain him. and that his nervous system was so shattered that he cannot rest at night, and wakes up with a start or jerk as if frightened.

While there is some evidence tending to show that appellant could use his arm if he thought he could, yet there is no evidence· tending to show that he was simulating in that regard. The evidence shows that he was honest in that belief; and if that is true, it would argue, if anything, that he was still unbalanced mentally.

Finding no error in the record committed in favor of the appellant, and holding, as previously stated, that the court erred in setting aside the verdict and judgment in favor of appellant, because of the incapacity of the guardian of plaintiff to sue in the courts of this State, we are of the opinion that the judgment should be reversed and the cause remanded to the circuit court with directions to set aside the order granting a new trial, and reinstate the judgment theretofore rendered in favor of the appellant, as of the day of its rendition.

It is so ordered.   All concur.