HUBERT EVANS v. MANIE PARTLOW ET AL., Appellants.—16 S. W. (2d) 212.

Division Two, March 2, 1929.

*Don O. Vernon, L. C. Mayfield* and *Schmook & Sturges* for appellants.

14

16

*Sid C. Roach* and *Barney Reed* for respondent.

HIGBEE, C.—This is an action to contest the will of plaintiff's father, William B. Evans, a farmer of Camden County, who died July 29, 1924, at the age of fifty-five, leaving a last will dated October 12, 1916. The testator devised all his property to his four sisters who, with their husbands and the executor, Lynn Partlow, are the appellants. A clause in the will reads: "I also bequeath to my son, Hubert Evans, the sum of Five Dollars ($5.00)." The will was admitted to probate and letters testamentary granted on August 8, 1924. The verdict, signed by nine jurors, found "that the paper writing produced and read in evidence is not the will of William B. Evans, deceased." Judgment was entered on the verdict and the defendants appealed.

The will was executed and attested by three witnesses on October 12, 1916. The petition alleges, *inter alia*, that "at the time the alleged will was published and declared as his last will and testament, the said William B. Evans was not of sound mind, but on the contrary thereof, was of unsound mind, *especially toward his only child, Hubert Evans,* and wholly incapable of making a testamentary disposition of his affairs and property, and your petitioner further avers that at and previous to the date of the making of the said will the said William B. Evans was unduly influenced," etc. The answer propounds the will. During the trial of the case the court permitted plaintiff to amend his petition by interlining the words italicized. At the conclusion of the testimony, the court sustained a demurrer to the evidence on the charge of undue influence.

William B. Evans, after the death of his father, lived with and supported his mother and four sisters on a poor eighty-acre tract his father had owned in Camden County. In 1895, Evans married Miss Ida Bailey and they lived with his mother and sisters for about fourteen months, when the young wife separated from her husband and returned to her former home. No doubt she resented having to submit to her husband's mother and sisters and felt that she was not accorded her rightful place in the household. From that time on Evans was very bitter against his wife and her people. Soon after the separation, Evans told his neighbor Brown that his wife was "in a family way, but the child is not mine; it will be over nine months from the time we separated when it is born; just watch and see if it ain't." He claimed to have procured a divorce from his wife in Pulaski County. No witness testified to having seen or read the record of the divorce. The date and cause for the divorce, if one was granted, are not known, as the records of the court were destroyed by fire. It seems, inferentially, that he lived all the while in Camden County. The young wife gave birth to the child, the plaintiff, Hubert Evans, about six months after the separation. When Hubert was two years old, his mother took him to his father, left him there, and he was thereafter cared for in his father's house by his father's sisters who continued to live there until they were married. After 1901 or 1902, Evans and the boy lived alone until 1911, when Hubert was fourteen years of age. About the year 1906, a preacher, called the "cowboy preacher," held a meeting in the neighborhood which Evans attended. In one of his sermons the preacher declared that anyone who would divorce his wife was living in adultery and could not enter the kingdom of heaven. Evans talked to Hubert about that sermon and from that time a change came over him. He repeatedly told Hubert he was not his son, that he was an illegitimate child, and that he would disown him. He began to whip and beat him, sometimes once a week, sometimes twice. This continued and grew worse from 1906, when the boy was about nine years of age, until Hubert ran away in 1911. During all this time the boy stood

in dread of his father. As one witness said, he feared him as he would a panther.

About 1908, Hubert and a neighbor boy ran off to Lebanon in Laclede County. Evans's brother, Corbett Evans, followed them and brought them back. As I read the record, Evans claimed the boys had stolen some cigars from a store. Evans met the boys as Corbett was bringing them home, became furiously angry, picked up a rock that filled his hand and threw it at Hubert, striking him on the back of the neck and knocking him down. The next day Evans stripped the clothes from Hubert, tied his hands and feet, and beat him with a hickory sprout as thick as his thumb until the boy became unconscious. Evans afterwards told several of his neighbors about this whipping; that he took the clothes off the boy, tied his hands and feet and whipped him until he quit screaming, till he whined and his flesh quivered. When telling this to some of his neighbors he laughed about it. Finally, in 1911, Hubert ran away, and after going to different places, reached his mother in California. She had remarried, and he lived with her for three years until he returned to Camden County in 1923. The following are a few excerpts from the testimony for the plaintiff:

Henry DeBerry, Presiding Judge of the Camden County Court, testified to conversations with William Evans, as follows:

"Some way or other he had a grudge at his child. Well, he had a grudge at her people. He said to me that he didn't claim him as his; 'Hubert hasn't got a bit of Evans blood about him; he is full-blooded Bailey;' that's the way he talked. We always kept stock there at my place and Evans would come down to look at the cattle and this little boy would come with his father, and that child was afraid of him as a child could be of a panther or anything else. . . . I saw the boy quite frequently and he was a good boy so far as I know; a nice little boy. I talked with Evans about his child frequently, I called his attention to his abuse of the child and asked him not to do it. I did this perhaps a dozen times, and he would tell me that he knew his own business, something like that. . . . It was before the little boy went away from home, and I begged him not to mistreat him. Evans told me that he whipped the boy very hard; he told me that more than once. It appeared like that was on his mind. He would become nervous and excited every time he would get to talking about his mistreating him."

The witness gave it as his opinion that Evans could not have been of sound mind.

W. E. Brown, who was well acquainted with Evans, testified:

"I had a conversation with him in regard to his son Hubert about two months after his son left home and he said he hadn't heard from him and didn't want to. He said: 'I don't want to hear from him; if he was lying there in the mudhole and couldn't get out, I wouldn't pull him out, but would let him lay there and die.'"

Witness was of the opinion that Evans's mind was unsound on some points.

J. S. Webster, who knew William Evans and lived in the same neighborhood, testified, in part:

"Of course, I seen him pet his dog, kiss it, such as that. I saw that several different times; I couldn't say how often; he always seemed to think a lot of his dog; I seen him grab him up by the nose, pull him up and kiss him several times. I never saw him bite it in the mouth; I saw him kiss it in the mouth."

Further on in his testimony this witness, in detailing a statement made to him by testator, said:

"He said he started to the house and was talking to the boy; that he made the remark to the boy that he would send him to the reform school if he tried to run off any more, and the boy said: 'Where is that; I am ready to go now.' That he then stopped the team and told the boy, 'I am going to whip you,' and the boy jumped out of the wagon and started to run; that he jumped out and took after him and run him all about the woods there; he said: 'He ran across a sapling about half as big as my arm trying to get away and fell, and I caught him and drug him up to the team and took off my hitch rein; I pulled his clothes off, tied his feet and hands together, threw him down on the ground and told him to get up and run; I then got me a black hickory like that (holding up his thumb); I got a black hickory—it wasn't a hazel—and I went in on him; I laid it on him and he cried and rolled and tumbled; finally,' he said, 'he didn't cry like a child, he howled like a dog; I kept laying it on him and directly he got so that when I hit him he would just flinch up a little; then I quit.' I then said: 'Bill, you ought to be ashamed; don't you know you will drive the child away from home?' He then said: 'He has got so much Bailey blood in him that I have got to beat it out;' that is the substance of the whole thing. . . . He told me that story three different times and laughed about it once, and said: 'I don't think he will run off any more.' "

Again:

"I met William Evans something like a month before he got sick; we were talking and he raised the subject about Hubert being in to see him, and said: 'I was mistaken about him being a Bailey,' he said, 'he is an Evans; I think Hubert will come back this fall;' that would have been last fall, and he says: 'When he comes back I aim for him to have everything I have got; I offered him one of the farms if he would go on it when he was here,' but Hubert said he had a good job."

Fred Brown, a neighbor, testified in part:

"As to anything else that I have seen William B. Evans do there that caused me to wonder, I have seen him a number of times take his dog up and kiss it. I don't know how many different times I seen him get down on his knees and catch up the dog, take it by the

lip and kiss it in the mouth. One time I seen him kiss a sow that he had there. The sow walked up toward him like and he just reached down and said, 'Sweet girl,' and caught her on her jaws and kissed her in the mouth. I think that was in the summer of 1914. These occasions of prayer and singing that I have mentioned continued until he left that farm. I saw Hubert frequently while he lived there with his father. I never seen anything out of the way with the boy in behavior of any kind.''

This witness, in detailing a statement which was made by the testator about his son, said:

'' 'Well, maybe he will come back some time,' and he said, 'If he does I will kill him; I will shoot him down just like a dog if he ever sets a foot in my yard.' I said, 'Well, you surely wouldn't do that,' and he said, 'I will die working these two fingers,' and he pulled his coat up and said, 'I could show you a gun in there that I could kill a buffalo a hundred yards.' ''

Charley Brown testified concerning Evans as follows:

''I have seen him get down by his dog and pray and call him his little black boy, and pray for him, time after time. That was after he moved down there a little while. The last two years he seemed to do better. I have seen him plowing along and he would just stop and lay down in the furrow and pray and mourn and take on. I wasn't close, but could hear him, and he might have been in earnest about it, I don't know about that part of it, but that is the way he would act. He would stop his team and lay down in the furrow and pray . . . I seen him do that different times when he was in the field, just a lane between us. . . . I never saw him kiss his dog nor kiss any other stock in the mouth. I have heard him making a noise, hollering and laughing and going on, he would ha-ha and holler and laugh. I lived a quarter to a half mile away from him, I could hear him up there. That would occur maybe every day for a week or so, then maybe he would quiet down and I wouldn't hear him any more for a while. That was mostly after he first moved down there. It seemed like the last two years he quieted down some way, I couldn't say why. That was going on about six or seven years, I couldn't swear just how long he lived down there.''

Mark Burk, an intimate acquaintance of Evans, testified as to conversations with him, as follows:

''I have talked to him about his treatment of his son, but couldn't say how many different times. To tell it in my own language, after this boy left home Evans told me that he whipped the boy unmercifully. The first two or three time he talked about it he seemed to get enraged and told me one time that 'if that boy ever puts his foot on my place, I will kill him.' . . . I expect I had a dozen conversations with him along this line, trying to get him to be friendly with his boy.

"Upon the boy's return from California, I had a conversation with his father about him. . . . That evening he told me that when Hubert came back and he saw him going down through the field he favored Corbett Evans so much in his walk that he started toward him, and said: 'When I got close enough and saw it was Hubert I ran to him and embraced him,' and he also said that he was now reconciled to what I had been asking of him all the time, to admit him as an Evans and give him the right kind of treatment, and he said he would do it. . . . The way he spoke was that he had his will written, but he changed his mind. He didn't say he had changed his will, but he said he meant for Hubert to have this property. He said he told Hubert if he would stay here he would put him on a farm and stock it; that Hubert said he had a job out there in California. Evans offered to make him a deed to the Gooch place, stock it up, and Hubert said he was under promise out there and would go back and finish up, and he would go and then would come back."

Joe Webster, a witness for plaintiff, testified that Evans told him of his treatment of his child and, in describing his actions, said:

" 'I was talking to him [Hubert] and he wouldn't pay any attention and wouldn't answer me, so I grabbed up a rock just big enough to fill my hand,' he said: 'I ran up like that.' He didn't say whether he held the rock or turned it loose. He said, 'I aimed to hit him in the back of the head, but I hit him in the back of the neck and knocked the rascal down.' I said, 'Bill, you might have killed the child,' and he said, 'Well, he might as well be dead as to be like Dave Bailey;' that's just the words he told me. Dave Bailey was a brother of his boy's mother."

There was testimony on the part of some of plaintiff's witnesses that testator was a good farmer and capable of transacting his business; that he knew what property he had and that he had a son and four sisters. The inventory, filed by his executor, showed that Evans had real and personal estate at his death of the value of over $12,000. Two physicians, upon hypothetical questions, testified that in their opinion the testator, during a period of years from 1906 to 1922, was not of sound mind. It was also shown that the general reputation of testator's wife for virtue and chastity was good.

The testimony for the defendants was to the effect that the testator was a good farmer and capable in business matters; that by thrift and industry he had acquired three farms; that he knew what property he had and that he had a son and four sisters. He was a strong, vigorous and healthy man, weighed about two hundred pounds, and died of pneumonia. It was testified by his neighbors and physicians who attended him in his last illness that he was always and up to his death possessed of a sound and vigorous mind.

I. Appellants assign numerous errors. At the close of all the evidence the court, as we have seen, instructed the jury that there

was no evidence to support the charge of undue influence on the part of the defendants and that issue went out of the case. Appellants also prayed the court to instruct the jury that there was no evidence that at the time the will was made, the testator was of unsound mind and incapable of making a will. Appellants assign error in the refusal of this instruction.

We think there was substantial evidence to warrant the court in submitting the case. There was evidence on the part of the plaintiff that the testator at the time of making the will, was of unsound mind and especially so in reference to the plaintiff. In an action at law this court on appeal will review all the evidence and consider the reasonable inferences that the jury might properly draw therefrom, favorable to plaintiff's contentions, and in considering the demurrer, will ignore the defendant's evidence unfavorable to plaintiff, and if there is any substantial evidence to support the verdict, this court will affirm the judgment. [Lindsay v. Shaner, 291 Mo. 297 (4), 236 S. W. 319; Evans v. General Explosives Co., 293 Mo. 364 (2), 239 S. W. 487; Dutcher v. Ry. Co., 241 Mo. 137, 167, 169, 145 S. W. 63.]

Appellant contends that all the evidence shows that the testator had a sound and disposing mind and memory; that he was a thrifty, successful business man; that he knew what property he had and how he wanted to dispose of it in making his will, and that he had in mind, and mentioned in his will, those who were the natural objects of his bounty. Learned counsel say that plaintiff's case rests on insane delusions and was tried solely on that theory; that this theory, belief or delusion, originated before plaintiff's birth, but yielded to reason when the child was born within the period of gestation, and that later testator received the child and reared it as his own until the boy was eight or nine years old. Moreover, they say, any such belief, if it had been once existent, unquestionably yielded to reason when plaintiff returned to him in 1923 before the father died.

Evans felt bitterly towards his wife when she left him fourteen months after their marriage. He told his neighbors that the child would not be born within nine months after the separation and was not his. There is no contention that there was any basis for this delusion. The position of learned counsel is that the testator yielded to reason, received the boy from his mother when he was two years old and recognized him in his will and among the neighbors as his son. There is evidence, however, that after the cowboy preacher held the meetings which Evans attended, a marked change came over him. Thereafter he repeatedly told the boy and his neighbors that Hubert was not his son and he then began the brutal floggings which continued until the son ran away in 1911. He justified the floggings on the ground that he wanted to beat the Bailey blood out of him. There is much evidence from which it may be inferred that the will in which

he disinherited his son was made under the influence of this strange delusion and unnatural hatred of his son.

Appellants rely upon Benoist v. Murrin, 58 Mo. 307, and similar cases. In that case, at page 323, Judge WAGNER said:

"The definition, as to what constitutes a sound and disposing mind and memory, contained in the third instruction of the defendant, which was refused, was copied almost literally from the charge of the chief justice in Den v. Johnson (2 South, 454).

"Thereafter explaining to the jury the meaning and importance of the word 'sound' by itself, he went on and said, that a disposing mind and memory was a mind and memory which had the capacity of recollecting, discerning and feeling the relations, connections and obligations of family and blood. The whole charge, taken together, was approved in the Supreme Court, but it was intimated, that, in describing the force of the word 'sound' itself, too strong language was used."

In 28 Ruling Case Law 105, it is said:

"For example, a belief by a testator that his wife is unfaithful and that his child by her is illegitimate may be an insane delusion where he had no evidence justifying his belief. But if she had made a confession to adultery prior to the birth of the child, this fact may be shown in evidence as indicating that testator had good grounds to doubt the paternity of the child and therefore that his belief was not an insane delusion."

In 40 Cyc. 1014, at foot column 1, there is this citation from an English case:

"*Aversion of parents to children.*—It is unfortunately not a thing unknown that parents . . . take unduly harsh views of the characters of their children, sons especially. That is not unknown. But there is a limit beyond which one feels that it ceases to be a question of harsh, unreasonable judgment of character, and that the repulsion which a parent exhibits toward one or more of his children must proceed from some mental defect."

In Buford v. Gruber, 223 Mo. 231 (Syl. 1), 122 S. W. 717, it is said:

"A delusion which incapacitates a person from making a will, is the conception of the existence of something extravagant which has no existence whatever, but of which the person entertaining it is incapable of becoming *permanently* disabused by argument, reason or proof. Where the testator's aversion to a child is the result of an insane delusion, and his conduct in disinheriting her cannot be explained on any other grounds, his will should be set aside." (Our italics.)

See 40 Cyc. 1013.

In 28 Ruling Case Law, 108, near end of Section 59, it is said:

"The testator's antipathy toward a near relative may, however, be so extravagant and baseless as to amount to an insane delusion, and

the delusion may, in effect, prevent him from knowing the natural objects of his bounty."

In Ray v. Walker, 240 S. W. 187, we said (Syl. 5):

"One who cannot recall or comprehend what he has done for, or the obligations he morally owes to, the natural objects of his bounty, is without testamentary capacity."

In Everly v. Everly, 249 S. W. 88, 91, where it was claimed that the testator labored under a similar delusion, Judge WHITE said:

"The question of mental capacity involves whether the testator's mind was in such condition that he recognized his obligation to the objects of his bounty and their relation to him. Undoubtedly a very unjust disposition of his property, a disposition which would disinherit a deserving child, would be some indication of failure to understand his obligation to the child."

The opinion quotes from Ray v. Walker, supra, a citation from Meier v. Buchter, 197 Mo. 1. c. 89, 94 S. W. 883, as follows:

"But in order to sustain any unjust, unnatural or absurd will, which may be contested, fair proof at least should be afforded that the testator was of sufficient capacity at the date of the execution to comprehend its import. . . . In fine, a harsh, unnatural disposition by the will in question, is a circumstance which tends to discredit the maker's testamentary capacity."

There is ample evidence in this case from which the jury could find that the testator could not permanently rid himself of his delusion, and that he was unreasonably dominated by an overpowering aversion to his son that incapacitated him from discerning, comprehending, feeling and appreciating the deserts of his son and his natural obligations to him. It is not enough that he knew what property he had and knew he had a son and four sisters. To have testamentary capacity his mind must have functioned so as to enable him intelligently to weigh and appreciate his natural obligations to his son. The testator's long continued brutal conduct towards his son was unnatural and tended to prove that he was of unsound mind. The demurrer to the evidence was properly overruled.

II. Appellants assign error in the giving of plaintiff's Instruction 3. It reads:

"The court instructs the jury that although you may find and believe from the evidence that William B. Evans, deceased, at the time of executing the paper writing offered in evidence as his last will and testament had and possessed many of the mental requisites, in these instructions set out as necessary to qualify him to make a valid will, yet, if the jury further find from the evidence that the said William B. Evans had, for a long period of time prior to the execution of such paper writing offered in evidence as his will possessed a strong aversion, dislike, anger, ill-will or hatred toward his son Hubert Evans, and that such

aversion, dislike, anger, ill-will or hatred, if such you find, continued to and existed at the date of the execution of the paper writing offered in evidence as his will, and that such aversion, dislike, anger, ill-will or hatred, if any, overcame and controlled the will and judgment of the said William B. Evans in the execution of the paper writing offered in evidence as his will, and that without the operation of such aversion, dislike, anger, ill-will or hatred upon and controlling his mind and judgment the said William B. Evans would not have executed said paper writing offered in evidence as his will, then you should find that the paper offered in evidence is not the will of William B. Evans, deceased.

"But mere aversion, dislike, anger, ill-will or hatred, even though unreasonable, are not sufficient to defeat the will. The aversion, dislike, anger, ill-will and hatred, if such existed in the mind of said William B. Evans against his said son, must, in order to defeat the will, have been such as to overcome and control the will and dethrone the judgment of said William B. Evans in matters concerning his said son and must have existed at the time of the execution of the paper writing offered in evidence as his will."

The contention is that the instruction does not require the jury to find that such aversion or dislike was without cause or reason, or that it amounted to delusional insanity.

Defendant's Instruction 5 reads:

"Therefore you are instructed that if you believe and find from the evidence that at the time the will was made William B. Evans had sufficient understanding and intelligence to transact his ordinary business affairs and to comprehend the transaction then in question, the nature and the extent of his property, and to whom he was giving the same, then he had sufficient capacity to make a will; unless you further find from the evidence that said William B. Evans at the time he executed said will was incapable of making a will because of insane delusions as to his said son as defined in these instructions, or unless you find that said William B. Evans at the time he made said will had such an aversion, dislike, anger, ill-will and hatred towards his said son as to overcome and control his will and judgment as defined in the other instructions."

This instruction is twin brother to plaintiff's Instruction 3. They are couched in substantially the same language. Instruction 5 did not require the jury to find that the aversion or dislike were without cause or reason. It was not claimed at the trial that there was any justification for the testator's aversion to his son. The evidence was that Evans said the boy, a lad of nine years, had so much Bailey blood in him that he had to beat it out. Of course counsel would not claim justification for such atrocities.

The case was tried by defendants on the theory that the testator yielded to reason and became disabused of his delusion and of his aversion to his son; that he became reconciled and felt and appreciated

his natural obligations to him. The instructions are equivalents and show the theory on which the case was tried by the defendants. It must be tried on appeal on the same theory. Moreover, defendants' instruction is a solemn admission that there was evidence tending to prove that at time the will was made, the testator was subject to a delusion as to his son's legitimacy and that he was dominated by an unreasonable aversion to him. Again, when plaintiff's instruction is read as a whole, the latter part indicates and the jury would understand, if it were material, that the testator's aversion to his son must have been unreasonable. When the whole instruction is read it seems to be very favorable to the appellants and could not have misled the jury.

III. Instruction 4 told the jury that in determining the issue of testamentary capacity the will itself and all its provisions may be considered by the jury in connection with all other facts and circumstances given in evidence. This instruction is not, as appellants complain, a comment on the evidence and was properly given. [28 R. C. L. 90, sec. 40.]

IV. Dr. Moulder and Dr. Moore, on hypothetical questions propounded to them, each answered that in his opinion the testator, during a period of years from 1906 to 1922, was of unsound mind. Appellants in their brief say the hypothetical questions propounded to these experts were improper as not stating facts; that before the opinion of an expert can be admitted, the hypothetical question must embody substantially all the facts relating to the subject and that an opinion upon a partial statement of the facts has no value and is not admissible. They do not indicate wherein the questions are faulty in improperly stating the facts.

The questions set out in detail substantially all the facts and circumstances that were supported by plaintiff's testimony relative to the subject of testator's sanity. They do not assume any fact or circumstance not supported by plaintiff's evidence.

In Russ v. Railroad Co., 112 Mo. 45, 48, this court said:

"Counsel in propounding a hypothetical question to an expert witness may assume any state of facts which the evidence tends to establish, and may vary the questions so as to cover and present the different theories of fact. But there must be evidence in the case tending to establish all the facts stated in the question."

"In putting hypothetical question to the expert witness, counsel for the State had the right to assume the facts in accordance with his theory of them; it was not essential that he should have stated the facts as they actually existed." [State v. Privitt, 175 Mo. 207, 225, 75 S. W. 457.] See also Atkinson v. Am. School of Osteopathy, 199 Mo. App. 251, 268, 202 S. W. 452, and 22 C. J. 706.

The court properly overruled the objection.

V. The court refused defendant's Instruction 1 which reads:
"The court instructs the jury that although you may find from the evidence that the said William B. Evans was of unsound mind on October 12, 1916, the date of the execution of the will in question, but if you further find that after the execution of said will he became sane and ratified said will while of sound mind, the will in question will be the last will of the said William B. Evans, and your finding should be in favor of said will."

The instruction required the jury to find in favor of the will if they should find that the testator became sane and thereafter ratified the will, without requiring them to find that he was not laboring under the influence of an unreasonable aversion or hatred for his son. The instruction was, therefore, properly refused.

In Barth v. K. C. Elevated Ry. Co., 142 Mo. 535, 556, we said:
"If unsound principles of law have been incorporated in the instruction by the defendant, it was not error in the circuit court to refuse it or to fail to give a correct instruction of its own motion. In civil cases it is not the duty of the trial court to instruct of its own motion, if the parties neglect to ask proper instructions."

See also Trustees, etc., v. Hoffman, 95 Mo. App. 488, 497; Higgins v. Medart Pat. Pulley Co. (Mo. App.), 240 S. W. 252, 257; 38 Cyc. 1707, c.

VI. By plaintiff's Instruction 6 the court told the jury that William B. Evans, if of sound mind, as defined in these instructions, had the right to make an unreasonable, unjust and injudicious will, had the right to will his property to any one he desired and that the jury had no right to alter the disposition of his property simply because they might think Evans did not do justice to his son.

Instruction 7 told the jury that Evans had the right to dispose of his property by will and to such persons as he deemed proper and the beneficiaries in the will are not required to account for or explain such disposition, and if they find that Evans, on October 12, 1916, executed the instrument, then plaintiff can only avoid such will by showing to their satisfaction that said will was executed by Evans while of unsound mind as defined in these instructions.

Instruction 8 reads: "You are cautioned that peculiar and unusual conduct or eccentricities of character are not grounds for defeating a will."

Appellants complain in their brief of the refusal of their Instructions D, E, F, G and H. The complaint is that in a case like this where the jurors become prejudiced against the testator because of his harsh treatment of his child, the court should give cautionary in-

structions which have a tendency to restrain such action by the jury, and that these instructions should have been given. They were covered by other instructions given for the appellants.

The verdict is supported by the evidence. Finding no error in the record, the judgment is affirmed. *Davis* and *Henwood, CC.*, concur.

PER CURIAM:—The foregoing opinion by HIGBEE, C., is adopted as the opinion of the court. All of the judges concur.