ETHELYN HAMNER and ETHELYN HAMNER, Executrix, v. ELIZABETH EDMONDS ET AL., Appellants.—36 S. W. (2d) 929.

Division Two, March 25, 1931.

282

*Harvey & Bellany* for appellants.

*Homer E. Rich* and *Robert D. Johnson* for respondents.

COOLEY, C.—Suit to contest the will of Bettie C. Hamner, deceased. From a judgment of the Circuit Court of Saline County in favor of plaintiff, setting aside the will, defendants have appealed. Ethelyn Hamner is the widow and sole devisee and executrix of John C. Hamner, deceased, who was a son of Bettie C. Hamner. She brought this action as plaintiff in her individual capacity and also in her capacity of executrix. The defendants are the three surviving children of Bettie C. Hamner and the children of a daughter who died after the death of said Bettie, together with the administrator of said daughter's estate. A son who is executor of Bettie C. Hamner's will was also named as defendant in that capacity.

Testatrix was the widow of L. J. Hamner who died testate in 1899. She and her said husband had six children, all of whom survived said L. J. Hamner. One, Mary Belle, thereafter and prior to her mother's death, died intestate leaving as her heirs her mother and her five brothers and sisters. John, plaintiff's husband, died testate September 3, 1924, leaving no descendants. By his will he made plaintiff his sole legatee and devisee. The will in controversy was executed by Bettie C. Hamner on December 8, 1924, and she died in April, 1925, being then nearly seventy-one years old.

By his will, executed in 1896, L. J. Hamner gave certain real and personal property absolutely to his wife, Bettie C. Hamner, whom he named executrix without bond, and directed her as such executrix to collect all money due his estate, including life insurance, and to sell his bank stock and other stocks and bonds and within three years after his death invest the funds thus obtained in real estate in Saline County, Missouri. The will then provides as follows:

3. "After my entire estate (except what I have given my wife absolutely) shall have been invested in Real Estate mentioned I bequeath & devise Said Real Estate to my said wife Bettie C. Hamner to be held by her during her natural life or as long as she shall remain my widow & if she shall remain my widow I give her the right hereby to dispose of said Real Estate by Will to whomsoever she may please, but it is my desire that she shall have no power to mortgage or encumber said Real Estate.

4. "If at my death she shall refuse within the time prescribed by law to accept the terms of this Will it is my desire that she receive what the law allows her & the rest of my estate shall be invested in the kind of real estate mentioned above for the benefit of my children who shall receive the rents and Profits until my youngest child shall reach the age of twenty one years at which time said Real Estate shall be equally divided among my children.

5. "If after my wife under the terms of this will shall have invested in Real Estate the money mentioned shall marry I desire that she have one-third of the Real Estate during her life & the other two-thirds shall be held for my children as mentioned above.

6. "I give and bequeath to my children Sallie C. Hamner, Lizzie S. Hamner, Riva Sue Hamner, John C. Hamner, Charles W. Hamner & Mary Belle Hamner the sum of One Dollar each believing that as their mother love . . them as well as I do she will make suitable provisions for them at her death, but should they not treat her with proper respect & as children should treat a mother in old age she can do as she pleases with my property by will.

7. "If my said wife chooses to make no will before her death then I wish my property in Real Estate to be equally divided among my six children above mentioned if the youngest shall have reached the age of twenty-one years & if said youngest shall not have reached that age the property to be held as above mentioned until that time."

Within three years after the death of L. J. Hamner his said executrix purchased several hundred acres of land in Saline County with funds obtained from her deceased husband's estate, taking title thereto in her own name, and on June 13, 1902, she executed a declaration of trust stating that she held title to said real estate under the terms of and on the conditions stated in her husband's said will, which declaration of trust was duly acknowledged and recorded in the Recorder's office of Saline County. Later she sold and conveyed a part of the lands so purchased, her children, including John, joining in the conveyance. The balance of the land so acquired she continued to hold till her death. It is in the land so held at Bettie C. Hamner's death that plaintiff claims an interest as devisee of her deceased husband, John.

The purported will of Bettie C. Hamner, here in controversy, disposes of her own property and that acquired with funds of her husband's estate as above shown, as follows:

"I will, devise and bequeath to my four children, Sallie Ingram, of Marshall, Mo., Elizabeth Edmonds, Riva Sullivan and Charles W. Hamner of Miami, Missouri, all of my property, real, personal and mixed, of every kind whatsoever and wherever situate, and whether held by me in fee simple or as trustee, and whether by purchase or inheritance or as legatee under the will and testament of my late husband, Luther Judson Hamner, in equal parts and in fee simple. I intend by this instrument to dispose of all property which I own in my own right, and also all right and property which I may hold in the estate of my late husband, and in pursuance of the provision of his will and testament."

Sallie Ingram died before the institution of this suit and her children and husband and administrator are parties defendant herein.

The grounds alleged in plaintiff's petition for setting aside said will of Bettie C. Hamner were (1) that at the time of executing same testatrix was not of sound mind and disposing memory and did not have mental capacity to make a will, and (2) that the purported will was procured by the undue influence of Charles W. Hamner, son of testatrix. The case was submitted to the jury on the first above mentioned ground only, the trial court refusing to submit the issue of undue influence.

Defendants, by their answer, admit the relationship of the parties, plead the will of L. J. Hamner, deny the allegations of mental incapacity and undue influence, make profert of the will of testatrix and ask that it be established as her will, and plead further that under and by virtue of the authority and directions of the will of L. J. Hamner said Bettie C. Hamner purchased said real estate and received deeds therefor "and became the owner in fee of said real estate, and was seized in fee and possessed of said real estate at the time of her death."

In the trial court the contest was waged mainly upon the issue of testamentary capacity of executrix. Defendants made proof of the due execution of the will and a sufficient prima-facie showing of testamentary capacity, whereupon plaintiff offered evidence tending to show the following:

About the year 1900 or 1901, testatrix became afflicted with inflammation of the joints, or arthritis, and from that date until her death could not walk and had to go about in a wheeled chair. In June, 1922, her mind was deranged, and on July 8 she was taken to a hospital at Marshall, Missouri, operated by Dr. A. C. Putnam, a doctor with twenty years' active practice. She remained in the hospital about twenty-six days. She was then, in addition to the arthritis, afflicted with diabetes mellitus in an advanced stage, with arterio-sclerosis or hardening of the arteries, not local but general and rather pronounced, and had senile dementia in a somewhat advanced stage, which ailments are progressive, i. e., grow progressively worse and are incurable.

It is in effect conceded that testatrix was of unsound mind when taken to the hospital in July, 1922. Dr. Grady, who had been her family physician, called by defendants in making their prima-facie case, so testified and testified also to her diabetic condition. He could not say that her then mental unsoundness was caused by the diabetes mellitus, but did say that if she had not had that ailment she probably would not have been of unsound mind. He also testified that hardening of the arteries may affect the mind if it is sufficient to impede a proper flow of blood to the brain; that he knew of no cure for either diabetes mellitus, hardening of the arteries or senile dementia. He thought, however, that testatrix's mind was clear after she left the hospital in 1922.

Dr. Putnam, called by plaintiff, had examined and treated testatrix while she was in his hospital, seeing her nearly every day, sometimes two or three times a day. He testified that she was afflicted, in addition to a general arthritis, with diabetes mellitus, arteriosclerosis and senile dementia as above outlined; that senile dementia is a weakening of the mind from old age and "disables" the patient mentally; that it is progressive and usually is "rather rapid in its progression;" that arterio-sclerosis usually progresses slowly; that it is usually one of the forerunners of senile dementia; that in his opinion it was the producing cause, or one of the producing causes, of testatrix's mental unsoundness; that diabetes mellitus in advanced stages also usually affects the mind. He described her actions and conduct, evidencing mental unsoundness, but since it is conceded that she was at that time mentally unsound these need not be mentioned. He testified that she was of unsound mind when brought to the hospital and when taken therefrom and that in his opinion such mental condition was permanent. He further testified that he saw and talked with her, though very briefly and not professionally, four or five times between the time she left his hospital and the making of her will, and was of the opinion that she continued to be of unsound mind. Sometimes she would seem to recognize him after he told her who he was. Once she appeared to have no recollection of ever having seen or known him even after he tried to recall himself to her memory. One such conversation was about July, 1923. There was one some months later, the date of which he could not fix.

Miss Pearl Ramey went to the home of testatrix about September 1, 1924, and remained there attending and caring for testatrix until about the middle of February, 1925. She testified that testatrix had the delusion that her son John (after his death) was going to kill her, expressing that fear repeatedly; that it became worse about November 1 and thereafter; that testatrix "was afraid someone was going to kill her," and when witness would leave the house at night to go to the store or post office testatrix would have her lock the doors and pull down the curtains because she feared someone would kill her; that on one occasion testatrix said that Charles (her son) had come into the house and gone upstairs and had witness look for him, but Charles was not there; that at different times testatrix would offer to pay witness her wages when she had already paid them, and would frequently repeat directions; that testatrix would often break down and cry; that she was afraid she was going to die and would cry about that; that after some time in November testatrix did not sleep well—"from then on I would have to be up with her every hour of the night;" and that in witness's opinion testatrix was of unsound mind.

On cross-examination witness could only remember one time, about November 1, that testatrix said John was going to kill her. The

cross-examination also developed the fact that testatrix directed the witness about small purchases and selected things to be purchased, paying for same and paying witness for her services with apparent understanding.

Lutie Meschede stayed with and cared for testatrix for several weeks after Miss Ramey left about the middle of February, 1925. She testified that several times testatrix thought someone was in the house and that she heard noises and had witness search through the rooms, when there was no one in the house but witness and testatrix; that testatrix was afraid someone was going to kill her and had witness lock the doors; that testatrix feared a neighbor whom she had long known was going to kill her. There appears in the record no ground for such fear. Testatrix would tell Mrs. Meschede to do things and after they had been done would again tell her to do them. Mrs. Meschede testified that in her opinion testatrix was of unsound mind.

Plaintiff testified that in her opinion testatrix's mind was unsound at and continuously after the time testatrix was in the Putnam hospital in 1922.

There was other testimony of lay witnesses to the effect that testatrix's mental condition was not improved after her sojourn in the Putnam hospital and that in the opinion of the witnesses she was mentally unsound prior to December 8, 1924, but the facts detailed by such witnesses upon which they based their opinions of mental unsoundness were of little, if any, probative value.

On March 3, 1925, testatrix was taken to the Fitzgibbon hospital in Marshall, where she remained for about a week and was examined and treated by Dr. Manning, the physician in charge. He testified that she then had diabetes mellitus and arterio-sclerosis, both in an advanced stage, a chronic joint infection which she had had for years, and that her mind was unsound; that arterio-sclerosis is a chronic disease, slow in its development, and was probably a factor in producing testatrix's mental unsoundness; that from testatrix's then condition and the diseases with which she was afflicted it was his opinion that her mental unsoundness had existed for some time. Testatrix's condition was not improved when she was taken from that hospital to her home.

There was other evidence that testatrix's mind was unsound when in the Fitzgibbon hospital, but it is needless to refer to it, as it seems to be conceded that her mind was then unsound and so continued to the end. Dr. Grady, appellants' witness, testified that her mind "gradually got bad from along the 20th (of February) on," and "got pretty bad by the end of the month." She died April 5, in a diabetic coma.

There was no evidence indicating that testatrix's son John had ever been other than a dutiful and affectionate son, or that the re-

lations between him and his mother or between his mother and the plaintiff had ever been otherwise than cordial. For some weeks not long before his death John and his wife had lived with testatrix. For several years preceding the making of testatrix's will they lived not far distant. Both before and after John's death plaintiff frequently visited and ministered to testatrix. Defendants' evidence shows that testatrix always spoke of both John and his wife with affection, that she "thought a great deal" of both.

The will in controversy was written by testatrix's son-in-law, Mr. Edmonds, husband of one of the appellants. Called by appellants, he testified that testatrix had spoken to him, about October, 1923, John being then alive, concerning the making of a will, saying in substance that she wanted to carry out her deceased husband's intentions, and sent him a copy of L. J. Hamner's will, but for some undisclosed reason no will was then written; that on December 8, 1924, appellant Charles Hamner told witness that testatrix wanted him, Edmonds, to write her will dividing "the property" equally among her four then living children; that he prepared the will and gave it to Charles and that later testatrix telephoned him it was what she wanted.

Appellant Charles Hamner, son of testatrix, testified that testatrix, on December 8, told him she wanted to make a will giving "her property" to her four children and requested him to ask Mr. Edmonds to write it and he conveyed that message to Mr. Edmonds; that testatrix did not mention Ethelyn Hamner nor the property that had come from her husband's estate. Q. And the only property she said she wanted to will away was her property? A. That is all she said, just wanted to give what she had to her children. He testified further that he never heard testatrix give any reason why she wanted to "will the property away from the plaintiff."

Defendants produced some seventeen witnesses, friends and acquaintances of testatrix who had known her for years, some of them business men with whom she had transacted business, whose testimony tended to show that testatrix's mind was sound and clear at and prior to the time the will was written. In the view we take of the case a resume of their testimony is unnecessary.

I. We shall first consider appellants' contention that plaintiff in no event has any interest in the estate or in the probate of testatrix's will and therefore no right to maintain this action. Plaintiff is not an heir of testatrix, nor an heir or devisee of L. J. Hamner. She claims and can take only through her deceased husband. If he had no interest capable of passing by his will plaintiff can have none that entitles her to contest testatrix's will.

Appellants in their answer asserted fee simple title to the lands involved in testatrix. In their brief here they contend that L. J. Hamner's will shows it to have been his intent that his children or their descendants *living at the time of his widow's death* should take the property and that his will should be so construed; that John's interest being contingent upon his outliving his mother, which he did not do, his devisee, the plaintiff, takes nothing.

We do not assent to either view. The devise to his widow in L. J. Hamner's will is not of the property generally, without restriction or limitation, followed by an unrestricted power of disposition, but is expressly limited to her life or widowhood, with power of disposal by will if she did not remarry. Since she did not remarry nor reject the will, clauses 4 and 5 thereof may be disregarded, except as they may tend to show that the testator had his children in mind and meant for them to have the real estate referred to, subject to the interest therein which he gave to her. The events provided for in clauses 4 and 5 not having occurred the remaining clauses govern the devolution of the property. By clause 3 the widow's interest is expressly limited to a life estate with the added power to appoint or dispose of the fee by will. The testator does not himself in that clause attempt to dispose of the remainder in fee. He does that, in the event his widow shall have made no will, in clause 7, giving it there to his "six children above mentioned," whom he has specifically named in clause 6, John being one of the six so named.

(a) An estate expressly limited by the instrument creating it to an estate for life in the donee is not enlarged into a fee simple in the donee by a power given the donee to dispose of the property by sale. [Edgar v. Huff, 235 Mo. 552, 139 S. W. 122; Dunbar v. Sims, 283 Mo. 356, 222 S. W. 838; Grace v. Perry, 197 Mo. 550, 562 et seq., 95 S. W. 875, and authorities cited.]

Neither is such life estate enlarged into a fee by the addition of a power in the donee thereof to dispose of the property by will. [Von Behrn v. Stoeppelmann (Mo.), 226 S. W. 876; Rubey et al. v. Barnett, 12 Mo. 3; 2 Underhill on Wills, p. 944, sec. 688; Harvard College v. Balch, 171 Ill. 275.]

Testatrix herein did not own the fee in the lands in question.

(b) Was John Hamner's interest contingent or vested? We think it was clearly a vested interest. The power given by the will of L. J. Hamner to his widow to dispose of the property by will did not prevent the vesting of the remainder in his children immediately upon the death of Mr. Hamner if, absent such power of appointment, the interests given said children would have so vested. The interests in such case would

vest subject to be divested by the valid exercise of the power as to so much or all of the property going to any child as was disposed of by such appointment. See authorities in paragraph (a) hereof, supra; 23 R. C. L. p. 512, sec. 45, p. 530, secs. 71 and 72; 2 Underhill on Wills, 1313-14, sec. 868; Collins v. Whitman (Mo.), 222 S. W. 840; Sandford v. Blake, 45 N. J. Eq. 247, 250, 17 Atl. 812.

In the will of L. J. Hamner there is no language which we think indicative of an intent on his part that only such of his named children as should survive their mother should take under his will, nor that the vesting of their interests should be postponed until her death. No provision is made for the children of any child who might die leaving children prior to the widow's death. It can hardly be supposed that Mr. Hamner intended to provide that the property should go, at the widow's death if she made no will, to those only of his children who survived their mother and to the exclusion of the children of any child who might have died prior to her death. There is nothing in the will inconsistent with the conclusion that Mr. Hamner intended the remainder to vest in his named children at his death, subject to the widow's power of appointment.

"The law favors vested estates, and, where there is a doubt as to whether the remainder is vested or contingent, the courts will construe it as a vested estate." [Chew v. Keller, 100 Mo. 362, 368, 13 S. W. 395. See also Dunbar v. Sims, supra; Tindall v. Tindall, 167 Mo. 218, 66 S. W. 1092.]

". . . Every gift to a person who is alive at that date (testator's death) vests at once, in the absence of an expression of an intention that the vesting shall be postponed. It will be presumed, when the testator does not expressly or by implication indicate that the vesting of the title to his bounty is to be postponed, that he means it to vest at once upon his death." [2 Underhill on Wills, p. 1299, sec. 861. See also Henderson v. Calhoun (Mo.), 183 S. W. 584.]

Appellants cite but one case in support of their contention that John took only a contingent remainder under his father's will, viz., Eckle v. Ryland, 256 Mo. 424, 165 S. W. 1035. That case construed an instrument so unlike the will of L. J. Hamner that it lends no support to their contention.

(c) John Hamner's interest in the lands in question having been a vested interest it was subject to devise by him and passed by his will to the plaintiff. [Edgar v. Huff, supra; Dunbar v. Sims, supra; Harvard College v. Balch, supra; 23 R. C. L. p. 576, sec. 130.] Plaintiff, as John Hamner's devisee, having thus acquired his interest in the land, of which she would be divested if Mrs. Hamner's will is valid, has a direct pecuniary interest in the probate of that will and is entitled to contest the same. Section 537, Revised Stat-

utes 1929; Watson v. Alderson, 146 Mo. 333, 48 S. W. 478, holding that a judgment creditor of heirs who but for the will would have inherited property which would have been subject to the creditor's judgment lien was interested in the probate of the will, within the meaning of the statute, and authorized to contest the will, the establishment of which would deprive such creditor of property rights. The reasoning in the Watson case leaves no room for doubt that plaintiff, as her husband's devisee, is authorized to prosecute this suit.

II. The further point is made that Ethelyn Hamner *as executrix* of her husband's estate was not a proper party. She was joined in that capacity upon the theory, shown by her pleading and proof, that her husband's estate was insolvent and that, as executrix, she would be bound to use this property in payment of claims pleaded and proved to have been allowed against his estate. We need not determine whether or not she could maintain the suit as such executrix under the circumstances. The misjoinder, if it was such, fully appeared upon the face of the petition and was waived by defendants' failure to demur thereto. They neither demurred to the petition nor raised the question of defect or misjoinder of parties by answer, therefore waived and cannot now assert it. [Secs. 770 and 774, R. S. 1929; Pettingill v. Jones, 21 Mo. App. 210; Crenshaw v. Ullman, 113 Mo. 633, 20 S. W. 1077; Crowl v. Am. Linseed Co., 255 Mo. 305, 327, 164 S. W. 618; Copeland v. Davis, 253 S. W. 427.]

III. Upon the issue of testamentary capacity we think there was substantial evidence from which the jury might find, as it did, that testatrix was not of sound and disposing mind when she made the will in controversy. It is not here a question of the *weight* of the evidence. Had the trial court set aside the verdict on the ground that it was against the weight of the evidence we would consider upon the record presented that it had acted well within its rights, but that court declined so to do. It is well settled that in a will contest, as in other law cases, if there is any substantial evidence in support of plaintiff's case and the trial court has declined to set aside the verdict in plaintiff's favor as being against the weight of the evidence, this court will not reverse on that ground. It is also the well established rule that in determining a demurrer to the evidence in such cases the plaintiff is entitled to have the evidence in his favor taken as true and to the benefit of such favorable inferences as may legitimately be drawn therefrom, and to have countervailing evidence of defendants rejected. [Fowler v. Fowler

(Mo. Ct. en Banc), 2 S. W. (2d) 707, 709; Dunkeson v. Williams (Mo.), 242 S. W. 653, 659; Smarr v. Smarr (Mo.), 6 S. W. (2d) 860, 862.] It is true that the witnesses who were present at the execution of the will testified that at that time testatrix was of sound and disposing mind. But it was shown and conceded that testatrix's mind was unsound in 1922. There was evidence from which the jury might have found that such mental condition was produced by causes which continued to operate with increasing effect and that it was permanent. It was shown and virtually conceded that she became hopelessly incompetent mentally within some two and a half months after making the will and from the evidence the inference may legitimately be drawn that such mental collapse resulted from causes which had been operating and undermining her mentality from a time long before the making of the will. There was also some testimony of lay witnesses tending to show mental unsoundness immediately preceding the time of the execution of the will.

In Byrne v. Fulkerson, 254 Mo. 97, 123, 162 S. W. 171, 179, this court said:

"The principal insistence, however, is that there was no direct evidence that on the day and at the hour the will was signed testatrix was insane. It is undoubtedly true that the real question is as to the sanity of testatrix at the time she signed the will (Von DeVeld v. Judy, 143 Mo. l. c. 363; Winn v. Grier, 217 Mo. l. c. 451), but it does not follow that the proof of testamentary incapacity at that very moment must be made by eyewitnesses on that occasion. Proof of insanity permanent (and here progressive) in its nature raises a presumption of continuity which it is incumbent upon proponents to rebut, and substantial evidence of mental unsoundness of that character with the evidence of proponents to the contrary generally ought to be sent to the jury so that they may resolve the conflict. [Buford v. Gruber, 223 Mo. l. c. 253.]"

See also Dunkeson v. Williams, supra, to same effect, and see Byrne v. Fulkerson, supra, for statement of the rule as to what constitutes testamentary capacity.

It is suggested by respondent that the failure of certain defendants who were children and beneficiaries of testatrix to testify, raises a presumption that their testimony, had they been called, would have been injurious to defendants' cause. Without considering that question we are satisfied that plaintiff made a case for the jury on the issue of testamentary capacity.

IV. It is claimed that the court erred in admitting in evidence records of the probate court showing that John Hamner's estate

was insolvent and that demands had been allowed against same in excess of the assets of the estate aside from his interest in the lands here involved. If Ethelyn Hamner as executrix was a proper party upon the theory that, as executrix, she would be required to use the property here involved in payment of her decedent's debts, the evidence was competent for the purpose of showing such fact. Whether in such capacity she was a proper party or not we think that since defendants waived the now-claimed misjoinder and proceeded to trial on the issues as made by the pleadings, the trial court should not now be charged with error in that respect.

Moreover, for other reasons, we think that such evidence was competent. Evidence showing the financial condition and needs, known to a testator, of those who are the natural objects of his bounty, where there is a question of testamentary incapacity, is competent.

"The character of the provisions (of the will), however, as being just or unjust, reasonable or unreasonable, may be considered by the jury as tending to throw light on the capacity of the testator. Evidence is therefore admissible tending to throw light on the question of the justice or reasonableness of the will. *Such evidence usually relates to the relative situations and needs of those having a claim on the testator's bounty, and to the relations between the testator and those receiving or claiming to have been unfairly deprived of this bounty.*" [Mowry v. Norman, 223 Mo. 463, 470.]

If it be argued that Ethelyn Hamner, being only the widow of a deceased son of testatrix, was not, properly speaking, a natural object of her bounty, it must be remembered that under the circumstances of this case it is not a question of Ethelyn receiving a gift from testatrix. She does not claim any part of Bettie C. Hamner's estate. The property she claims comes through her deceased husband from his father's estate and the effect of testatrix's will, if valid, would be to take that property, otherwise hers, away from her. In these circumstances the principle embodied in the above quotation from Mowry v. Norman should apply.

V. Complaint is made that the court erred in refusing defendants' requested instructions numbered 7 and 10. Number 10 would have told the jury peremptorily that under the pleadings and under the provisions of L. J. Hamner's will, Bettie C. Hamner had the right by her will to dispose of the property she held in trust under L. J. Hamner's will in any manner she saw fit and proper. It ignored the question of testamentary capacity and, to say the least, would have been misleading to the jury. It was properly refused.

Instruction No. 7 is long. It told the jury in substance (1) that the issue in the case was whether or not the document read in evidence as Bettie C. Hamner's will was her last will and testament; (2) that every person twenty-one years of age and of sound mind may dispose of his property by a will in writing, signed and witnessed, etc., (defining how it must be executed); (3) that if Bettie C. Hamner was of sound mind and disposing memory and executed the will in question by, etc., (defining how a will must be executed and witnessed), then she had the right to dispose of the property belonging to L. J. Hamner's estate as she saw fit and proper.

In other instructions given at defendants' request, the jury was explicitly told that the sole issue for its determination was whether or not testatrix had sufficient testamentary capacity to make a will, as in other instructions defined, at the time she executed the instrument in question. There is no contention that the jury was not properly instructed regarding testamentary capacity.

Conceding that paragraphs 2 and 3 of Instruction 7 contained a correct statement of law, we are unable to see wherein the legal information contained therein could have aided the jury in any proper manner, in determining whether testatrix had sufficient mental capacity to make a will as was said of an instruction containing a correct statement of law in Wiggington v. Rule (Mo.), 205 S. W. 168, 181. There was no intimation in any instruction given that testatrix, if of sound mind, did not have the right to dispose of said property as she saw fit. The court did not err in refusing to emphasize, by giving Instruction No. 7, that she had such right. Instructions in somewhat similar vein were condemned by this court in Everly v. Everly, 249 S. W. 88, 91, and Hartman et al. v. Hartman et al., 284 S. W. 488.

VI. Appellants urge that a new trial should have been granted because the verdict was the result of passion and prejudice of the jury and because plaintiff cried while on the witness stand, thus exciting the sympathy of the jury. She did cry a little once or twice when referring to her deceased husband. It does not appear to have been done with ulterior motive and the court was not requested to rule or take any action concerning it. We see nothing in the record calculated to arouse the passions or prejudices of the jury.

The judgment of the circuit court is affirmed. *Davis* and *Westhues, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All of the judges concur.