ADELINA TAVEGGIA, ANRICHETTA GERIANI and MARIA LOVATTI v. ANNA PETRINI, Appellant.—No. 38132.—177 S. W. (2d) 513.

Division One, February 7, 1944.

*George Eigel, Julius J. Selvaggi* and *A. A. Alexander* for appellant.

*Joseph N. Hassett* and *Vernon L. Turner* for respondents.

BRADLEY, C.—Action to contest the alleged will of John Taveggia, deceased. The jury found against the will; judgment so went, and defendant appealed.

The will was executed June 11, 1938; testator died August 16, 1938, at the age of 43; will was admitted to probate August 22, 1938; this cause was filed May 10, 1939; was tried March 10, 1941; and bill of exceptions filed October 25, 1943.

Testator was born in Italy; came to the United States when about 14; was never married. Plaintiff, Adelina Taveggia, was testator's mother, but she died in Italy about 10 months after the death of testator. Plaintiffs Anrichetta Geriani and Maria Lovatti are his sisters. Defendant is named as executrix in the will and is the chief beneficiary. During the last years of his life, the testator resided in the home of defendant. Testator's estate, real and personal, was inventoried at $12,447.19. The will gave $25.00 to the mother and $10.00 each to the sisters; residue to defendant.

The grounds alleged were undue influence, on the part of defendant, and mental incapacity, but only mental incapacity was submitted.

Error is assigned (1) on the refusal of defendant's demurrer to the evidence; (2) on instructions given for plaintiffs; and (3) on the admission of evidence.

Was the evidence sufficient to support submission? Dr. Harold Russell Langdon finished his medical course at Queen's University, Canada, May 26, 1938, and was an interne at City Hospital, St. Louis. He saw and examined testator at the hospital August 9, 1938, about two months after the execution of the will, and from his examination

and the history given by the testator, Dr. Langdon made the hospital record, for that date, of testator. The record made by Dr. Langdon gave physical condition in detail, in which is mentioned tremor of the tongue, but mental condition was not mentioned. In the "personal history", it was stated, "Drinks a lot of hard liquor."

Dr. Langdon was a witness for plaintiffs and testified that he had testator under his observation from the time he entered the hospital until his death, a week; that "a fine tremor of the tongue characterizes any acute alcohol condition"; that "he had extreme jaundice"; "shakiness of his hands"; had no interest in the examination, and was irritable, uncooperative; "didn't want to be questioned"; "couldn't hold his attention long enough to get a coherent history"; "appearance untidy"; breath foul; "didn't seem to have very much use of the English language"; "speech was slovenly or thick"; that a prior (Feb. 25, March 7, 1936) record of testator in the hospital showed that he went to the "DT ward and (that) he was there for chronic alcoholism"; that "DT means delirium tremens"; that the record further showed "clear mentally with no pain"; that the record showed that testator was in the hospital July 16-19, and August 19-21, 1936, June 25 to July 15, 1937; that the July 16, 1936 record showed "brought in by police"; "diagnosis of chronic alcoholism"; "somewhat trembly and shaky"; "put to bed where he slept well over night and sobered in the A. M.; showed some delusional trends and begged to be discharged because some people were after him to do him harm; delusions disappeared in the 48 hours and improved condition warranted discharge; delusional trends are common in chronic alcoholics."

The August 19-21, 1936, hospital record showed "diagnosis of cirrhosis of liver"; "obstructive jaundice"; "carcinoma of the pancreas?" The June 25, July 15, 1937, hospital record showed "final diagnosis was cirrhosis of the liver, hypertrophic biliary"; "lethargic and incoherent"; "jaundiced."

Dr. Langdon was asked to give his opinion as to testator's mental condition, based on the hospital record, and his own examination, and answered: "It is my opinion that his mentality was chronically, had been chronically lowered by the amount of alcohol he had been taking, and by the amount of liver damage that had been sustained by that alcohol. . . . It is my opinion he was in no way capable of either ▮▮▮▮ looking after himself or making any disposition of anything that he had. Q. So you would be of the opinion that he would not be capable of carrying on the ordinary affairs of life, or disposing of his property, or knowing what property he had to dispose of, or who were the natural objects of his bounty, is that correct? A. That is correct. Q. Now, doctor, taking into consideration your observation of him when you first saw him in August of 1938, and subsequent observation of him, and also the history which you have related here as

the history of the City Hospital showing the number of times and for how long this man suffered from chronic alcoholism, will you tell us in your opinion how long, in your opinion, his mind had been so affected that he could not carry on the ordinary affairs of life, or know the nature and extent of his property, or know the persons who would be the natural objects of his bounty in disposing of his property, who he would want to give it to? A. That is a long question. I believe I could safely say that he was in—he didn't have the mental capacity to look after himself or make any disposition of what he had for a good long time before he was admitted to my service. I would say, judging from the history that I read to you that it would be at least one or more things (years). He had delusional trends a long time before I saw him, and he had been in several times with diagnosis of chronic alcoholism, which once established is an admission that the cells of the higher centers of thinking have been permanently damaged and can't resume their original function. That is the basis on which I make that assertion.''

Dr. James H. Ready, medical director, General American Life Insurance Company, a witness for contestants, testified that he knew testator 1931-1934. ''I treated him for effects of alcohol the first time in February, 1932, at St. John's Hospital, and again the evening of April 4, 1932, when he remained until April 8th. Prior to 1932, I treated him for varicose veins. On February 3, 1932, he was having hallucinations, saw dogs, and was extremely nervous, couldn't sleep. and had definite evidence of delirium tremens. . . . Between April 4 and April 8, 1932, he had hallucinations; at times he was not oriented and at times disoriented. . . . Delirium tremens causes hallucinations through over indulgence. It is either temporary or permanent, depending upon the degree of intoxication at the time that influences the severity of the hallucinations of the brain due to this chronic poisoning. A man can recover from acute alcoholism. Acute alcoholics have deliriums. Chronic alcoholics will have a certain amount of deterioration of the brain cells. The acute alcoholic will develop many hallucinations. Might have warped ideas from day to day. Hallucinations may be at intervals.''

Dr. Charles Montani, a witness for contestants, testified that in 1930, he treated testator ''for delirium tremens''; that in October, 1930, he ''was called back and he (testator) had a similar condition. . . . Between 1928 and 1930, I saw him once or twice a month; sometimes on the street as I drove by. From my observation of him and treatment to 1930, I would say he was a chronic alcoholic.''

Lay witnesses for contestants testified as follows: Louise Oldani testified that she had seen ''John (testator) intoxicated around the store (where she and John worked); toward the end (at that store, in 1934) it was almost steady. On occasions they had to go and help him. Several of these times was over at Mrs. Petrini's (defendant's)

business on Theresa, and a couple of times at her residence on Evans avenue, and that was back in the years 1932 and 1934. John first worked as a clerk in my father's store and then he became a partner in the business, after he worked there some 3 or 4 years, and stayed in partnership until he left about 1933 or 1934.''

Mary Oldani, testator's cousin, and known to him for many years, that she saw him at the hospital in 1937, and that he did not recognize her and her mother; that ''his mind would wander from one thing to another''; that ''from observation of John Taveggia in 1937 at the City Hospital, it was my opinion he was in no condition to write a will because I witnessed many a will for my customers (in grocery store) and from my experience in John's condition he could not write a will.''

John Oldani, cousin, that ''John (testator) was a heavy drinker, and on several occasions, I had to go and get him and bring him home because he was not able to drive a car''; that on one occasion he ''went to Mrs. Petrini's (defendant's) saloon to get him.''

Mary Lovatti, a sister and a contestant, that she lived in Detroit, Michigan; ▪▪▪ that she saw John in 1936, in St. Louis, at Mrs. Petrini's. ''On that trip, I was here 3 or 4 days and I had some conversation with John about the place he was living. He said he didn't like to live on Dago Hill any more. We had something to eat at Mrs. Petrini's house. When John and I were not at Mrs. Petrini's I asked him why he didn't marry Mrs. Petrini and he said that some time he was going to marry Mrs. Petrini, and I told him that mother said people were talking why he stayed by the lady and didn't get married, and he said some day he would get married.' . . . I talked with Mrs. Petrini and asked her why she didn't marry John and she said that she was older than John. She told me to order my brother to stop drinking. She said he drank a lot and that he got sick on account of drinking. . . . In 1937, he was awful sick and she wrote me a letter to come and see my brother and I came and saw John at City Hospital. I was here about 5 or 6 days. The first 2 or 3 days I went with Mrs. Petrini to see John in the hospital. When I went with Mrs. Petrini to the hospital we would spend sometimes half an hour, sometimes three-quarters of an hour. I would say to him, 'Look what you look like, you get sick, you get drunk all the time and look kind of condition you are in.' He was yellow and looked awful bad. . . . The second day I went to see John, I believe he didn't recognize me.''

Rose Oldani, cousin, that in June, 1938 (will was executed June 11, 1938), she and her mother saw testator at defendant's home; that he was in the kitchen ''eating Italian sausage''; that he had ''a bottle of wine on the table''; that ''his complexion was sallow, his eyes glassy. He was shaky and leaned on a cane. . . . My mother talked to him and asked him if he was taking care of himself and looking out for

his salvation and in case of death he would not be taken into a Catholic church, and she said, 'Why don't you and Ann (defendant) get married and at least spend the last few years of your life in peace', and he just laughed it off as if it was a big joke. It was a silly laugh. . . . In my opinion, from my observation of him that day, considering his condition, his laugh, I would say John Taveggia did not have sufficient mental capacity to take care of ordinary business of life, and to know the nature and extent of his property, or what he owned, or the natural objects of his bounty, or to whom he would want to leave his property in the event of his death.''

Antonette Oldani, testator's aunt, that he came from Italy to her house in St. Louis; that she kept him for 10 years; that John worked around her store; that she saw him in the hospital in 1937; that he did not recognize her. ''From 1937, when I saw John in the City Hospital, I never saw him again until the following spring when Rose and I went to see him and was there about an hour, and Mrs. Petrini was there. I told her Johnnie still drinks, she says he drinks a gallon a day.''

Defendant's case: Julius J. Selvaggi, an attorney, St. Louis, prepared the will, and he and Anna Seymour witnessed it. Mr. Selvaggi testified that some woman, he did not know ''who it was'', called him ''in 1938, about the will, and told me John wanted to see me about making a will.'' In response to that call, Selvaggi called on John, got the necessary information and prepared the will, and he said that ''Mrs. Petrini stepped out of the room when I explained the will to John.'' Selvaggi testified that testator, at the time he signed the will, ''was sane and capable of signing an instrument of that nature, and was able to tell me about his property.'' Mrs. Seymour said that John's mind ''seemed to be perfect''; that he was able to converse with her and tell her ''what he wanted.'' Ten other lay witnesses who knew testator, some for several years, testified that his mind, in their opinion, was sound. Defendant did not testify.

 ''In considering the demurrer to the evidence of contestants, the verdict being in their favor, the general rule obtains in a will contest as is the general rule, that we view the evidence in support of the verdict in the most favorable light, and give to the verdict all legitimate inferences which the jury could have drawn from the evidence.'' Proffer v. Proffer et al., 342 Mo. 184, 114 S. W. (2d) 1035, l. c. 1040, and cases there cited. Or, as stated in Fowler et al. v. Fowler et al., 318 Mo. 1078, 2 S. W. (2d) 707, l. c. 709, in a will contest case, where the verdict was against the will, as here, ''in determining the sufficiency of respondents' evidence, we must put the appellants' evidence out of consideration, save as it may aid respondents' case, and must accept respondents' evidence as entirely true and give respondents the benefit of every inference legitimately to be drawn therefrom.'' Viewed in such light, we think the question

of testator's mental capacity was for the jury. Proffer v. Proffer et al., supra; Erickson v. Lungren et al. (Mo. Sup.), 37 S. W. (2d) 679; Hamner v. Edmonds et al., 327 Mo. 281, 36 S. W. (2d) 929; Evans v. Partlow et al., 322 Mo. 11, 16 S. W. (2d) 212; Moll v. Pollack et al., 319 Mo. 744, 8 S. W. (2d) 38, 1. c. 43; Fowler et al. v. Fowler et al., supra; Whittlesey et al. v. Gerding et al. (Mo. Sup.), 246 S. W. 308; Lefever et al. v. Stephenson et al. (Mo. Sup.), 193 S. W. 840; Hoctor et al. v. Pavlick (Mo. App.), 199 S. W. 1038.

Complaint is made on plaintiff's instructions 3 and 6. As to 3, the complaint is that there was no substantial evidence upon which to base it. Instruction 3 submitted the alleged mental incapacity, and the point is ruled in disposing of the demurrer to the evidence.

It is said that instruction 6 "improperly directed the jury as to the credibility of the witnesses and the weight to be given their testimony." Able counsel do not point out in what way instruction 6 improperly directs. The instruction seems to be conventional.

On the assignment as to the admission of evidence defendant says that the evidence of Dr. Langdon "that deceased was of such mentality on August 9, 1938, that he was incapable of looking after himself or to make disposition of anything he had or disposing of his property or knowing what property he had to dispose of or who were the natural objects of his bounty, was prejudicial and incompetent and the court erred in admitting such evidence." Fields et al. v. Luck et al. (Mo. Sup.), 44 S. W. (2d) 18, is cited. Plaintiff makes the point that no objection was made to the evidence of Dr. Langdon. Counsel, on oral argument, indicated that there was some disagreement as to what the record showed, and by agreement, the original bill of exceptions was left with the Clerk. Reference to the bill shows that Dr. Langdon was asked if, from his observation and from the hospital record, testator, in his opinion, was "of sufficient mental capacity to carry on the ordinary affairs of life, that he knew the amount and nature and extent of his property, and the persons who would be the natural objects of his bounty in disposing of it, at the time you first saw him?" Following the question, the record shows: "Mr. Eigel: I object to that, your honor, that was in August of 1938, more than three months after the will was made, or two months and a half. Mr. Hassett: I will connect it up. The Court: Objection will be overruled. That is the basis of your objection, too remote? Mr. Eigel: Yes, sir."

Dr. Langdon answered as above set out, beginning, "It is my opinion that his mentality was chronically", and ending with, "It is my opinion he was in no way capable of either looking after himself or making disposition of anything that he had." There was no motion to strike. Then followed, without objection, the further evidence of Dr. Langdon, as appears, supra. And we might say that no complaint is made on the admission of any evidence by the lay witnesses.

410

In the situation, we are constrained to rule that defendant is in no position to complain on the admission of evidence. The judgment should be affirmed, and it is so ordered. *Dalton* and *Van Osdol, CC.,* concur.

PER CURIAM: The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.